Slip Op. 01 - 77

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - - - - x

NEENAH FOUNDRY CO. <u>et</u> <u>al</u>.,                       :

                                Plaintiffs,    :

                                  v.                  :

UNITED STATES OF AMERICA and THE UNITED : Court No. 99-11-00716
STATES INTERNATIONAL TRADE COMMISSION,
                                               :

                                 Defendants,      :

                             -and-               :

BENGAL EXPORT CORPORATION <u>et</u> <u>al</u>.,          :

                    Intervenor-Defendants.   :

- - - - - - - - - - - - - - - - - - - - - x

<u>Opinion & Order</u>

[Plaintiffs' motion for judgment on the
 agency record denied; action dismissed.]

                                  Decided: June 25, 2001

    <u>Collier Shannon Scott, PLLC</u> (<u>Paul C. Rosenthal</u>, <u>Robin H. Gilbert</u>, <u>Kathleen W. Cannon</u> and <u>Lynn Duffy Maloney</u>) for the plaintiffs.

    <u>Lyn M. Schlitt</u>, General Counsel, <u>James A. Toupin</u>, Deputy General Counsel, and <u>Charles A. St. Charles</u>, Attorney-Advisor, for the defendant United States International Trade Commission.

    <u>Cameron & Hornbostel LLP</u> (<u>Dennis James, Jr</u>.) for the inter-venor-defendants.

        AQUILINO, Judge:   This action contests the "sunset-review" determination of the International Trade Commission ("ITC") pursuant to 19 U.S.C. §1675(c)(1) (1995) that

> revocation of the countervailing duty order on iron metal castings from India would not be likely to lead to con-tinuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time.

<u>Iron Metal Castings From India; Heavy Iron Construction Castings</u>
<u>From Brazil; and Iron Construction Castings From Brazil, Canada,</u>
<u>and China</u>, 64 Fed.Reg. 58,442 (Oct. 29, 1999).  This decision
caused the International Trade Administration, U.S. Department of
Commerce ("ITA") to publish its notice of <u>Revocation of Counter-</u>
<u>vailing Duty Order: Iron Metal Castings From India</u>, 64 Fed.Reg.
61,602 (Nov. 12, 1999), prior to which the same plaintiffs as
appear herein had commenced a separate action for judicial review
of the final results of the ITA's sunset review.  <u>See</u> <u>generally</u>
<u>Neenah Foundry Co. v. United States</u>, 25 CIT ___, ___ F.Supp.2d __
(April 2, 2001).

I

The ITC rendered the foregoing determination qua India
over the dissents of two of its six voting members.  Those
comprising the majority refused to cumulate the imports from that
land with the merchandise from Brazil, Canada and China, notwith-
standing contrary Commission resolution of the reviews of all the
other duty orders covering castings from those three nations.  <u>See</u>
64 Fed.Reg. at 58,442.  Chairman Bragg and Commissioners Crawford
and Askey concluded that

> revocation of the order with respect to heavy construc-
> tion castings from India would have no discernible
> adverse impact on the U.S. industry and, therefore, do
> not cumulate subject heavy construction castings from
> India with the subject heavy iron construction castings
> from Canada, Brazil or China.

<u>Iron Metal Castings From India; Heavy Iron Construction Castings</u>
<u>From Brazil; and Iron Construction Castings From Brazil, Canada,</u>

and China, USITC Pub. 3247, pp. 12-13 (Oct. 1999). The fourth com-

missioner, Stephen Koplan, did not join in this finding of "no

discernible adverse impact on the U.S. industry" but did decline to

cumulate the imports based on his analysis of relevant conditions

of competition.

The plaintiffs now argue in their motion for judgment

upon the agency record filed pursuant to CIT Rule 56.2 that this

action "raises several important issues of first impression

concerning certain commissioners' interpretations of the cumulation

provision applicable in 'sunset' revocation proceedings", to wit:

> . . . In exercising his discretion . . . under the guise
> of considering "conditions of competition," Commissioner
> Koplan conducted an unlawful circular analysis of the
> effects of the imports on an individual-country basis in
> a manner that mooted the principle of cumulation. . . .

> * * *

> Likewise, Commissioner Askey analyzed cumulation in
> a manner contrary to the statute. Although the statute
> precludes the Commission from cumulating when it finds
> that imports are likely to have "no" discernible adverse
> impact, Commissioner Askey has wrongly interpreted this
> provision to mean that she may cumulate only when the
> record shows that imports will have "a" discernible
> adverse impact. As a result, Commissioner Askey has at
> once raised the burden for cumulating, altered the
> statutory standard, and created a pre-condition for
> cumulation that Congress did not intend. . . .

> Commissioner Crawford, too, has erred in her
> decision not to cumulate. In particular, [she] violated
> basic tenets of administrative law by failing to ade-
> quately explain her reasons not to cumulate, stating in
> one instance simply that she "declined to exercise her
> discretion to cumulate" imports from Brazil and China
> with the remaining imports and providing no further
> explanation. . . .

Plaintiffs' Rule 56.2 Brief, pp. 9-11.

A

The court's jurisdiction to decide this action is pursuant to 19 U.S.C. §1516a(a)(2)(B)(iii) and 28 U.S.C. §§ 1581(c), 2631(c).  And, whatever the issues raised herein, the ITC's determination must be affirmed unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law".  19 U.S.C. §1516a(b)(1)(B)(i).  Moreover, the rule has been that, in

> reviewing an agency's construction of a statute that it administers, this court addresses two questions outlined by the Supreme Court in <u>Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc</u>., 467 U.S. 837, 842-43 . . . (1984).  The first question is "whether Congress has directly spoken to the precise question at issue." <u>Id</u>. at 842 . . . .  If so, this court and the agency "must give effect to the unambiguously expressed intent of Congress." <u>Id</u>. at 843 . . . .  If, however, Congress has not spoken directly on the issue, this court addresses the second question of whether the agency's interpretation "is based on a permissible construction of the statute." <u>Id</u>.
>
> "To survive judicial scrutiny, an agency's construction need not be the only reasonable interpretation or even the most reasonable interpretation." <u>Koyo Seiko [Co. v. United States]</u>, 36 F.3d [1565,] 1570 [Fed.Cir. 1994].  Thus, when faced with more than one reasonable statutory interpretation, "a court must defer to an agency's reasonable interpretation . . . even if the court might have preferred another." <u>NSK Ltd. v. United States</u>, 115 F.3d 965, 973 (Fed.Cir. 1997)(citations omitted).

<u>U.S. Steel Group v. United States</u>, 225 F.3d 1284, 1285-86 (Fed.Cir. 2000).  <u>Compare</u> <u>United States v. Mead Corp</u>., 533 U.S. ___, ___ S.Ct. ___ (June 18, 2001).

(1)

The statute underlying this action is the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (Dec.

8, 1994), section 220 of which established five-year or "sunset" reviews of outstanding antidumping- and countervailing-duty orders to be conducted pursuant to:

**Special rules for section 1675(b) and 1675(c) reviews**

**(a)  Determination of likelihood of continuation or recurrence of material injury**

> **(1)  In general**
>
> In a review conducted under section 1675(b) or (c) of this title, the Commission shall determine whether revocation of an order . . . would be likely to lead to continuation or recurrence of material injury within a reasonably foreseeable time.  The Commission shall consider the likely volume, price effect, and impact of imports of the subject merchandise on the industry if the order is revoked or the suspended investigation is terminated.  . . .

19 U.S.C. §1675a(a).  In addition to explaining in further detail the factors the ITC is to consider in evaluating the likely volume of imports and their price effect and impact on a domestic industry, the statute provides for cumulation in sunset reviews as follows:

> For purposes of this subsection, the Commission may cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which reviews under section 1675(b) or (c) of this title were initiated on the same day, if such imports would be likely to compete with each other and with domestic like products in the United States market.  The Commission shall not cumulatively assess the volume and effects of imports of the subject merchandise in a case in which it determines that such imports are likely to have no discernible adverse impact on the domestic industry.

19 U.S.C. §1675a(a)(7).

B

In this matter, the ITC found that the prerequisites of initiation of reviews on the same day and competition in the U.S. market were met, and those findings are not at issue before the court. As for the other express limitation on Commission discretion to cumulate, namely, whenever subject "imports are likely to have no discernible adverse impact on the domestic industry", Commissioner Koplan was of the view that

> current volumes of subject imports from India, even with the countervailing duty order in place, exceed levels that would satisfy the "no discernible adverse impact" provision. There is no evidence in the record indicating that subject imports from India are likely to decline significantly upon revocation . . .. [W]ith at least a 17 percent share of the market, I cannot conclude that the subject imports from India are likely to have . . . no discernible adverse impact on the domestic industry if the . . . duty order is revoked.

USITC Pub. 3247, p. 28. Nonetheless, the commissioner declined to comulate, explaining that

> the conditions of competition would be significantly different for subject imports from India as opposed to those for subject imports from China, Brazil and Canada if the respective orders were revoked. Consequently, I find that it is not appropriate to assess cumulatively the likely volume and price effects of subject imports from India with those . . . from China, Brazil, and Canada.

Id. at 31. His discussion of such conditions of competition includes a comparative analysis of current and likely margins, volume, and price effects:

> . . . [T]he magnitude of the antidumping duty margins, and likely margins of dumping, for imports from China, Brazil, and, to a lesser extent Canada, are all signifi-cantly higher than the current and likely countervailing duty rate on subject imports from India. These are

significant differences in the conditions of competition for subject imports from India as opposed to subject imports from China, Brazil, and Canada.

Given this central condition of competition, I join the Commission's conclusion that neither the volume nor the price of subject imports of heavy metal castings from India are likely to significantly change if the counter-vailing duty order is revoked. Unlike the other subject countries, the current countervailing duty order has not had a material effect on the volume or price of subject imports from India. The Commerce Department, in its review of that order, found that the likely prevailing countervailable subsidy rate would be unchanged from the current rate. Viewed in this light, the capacity and capacity utilization figures for the Indian producers are not probative of the likely volume of subject imports if the order is revoked. The levels and ratios of their home market shipments and U.S. and third country exports have been largely unaffected by the existing countervail-ing duty order. Thus, unlike the other subject imports which are being restrained by the respective orders, current capacity and capacity utilization rates for producers in India are not indicative of whether exports to the United States likely would increase significantly if the order were revoked. In other words, since the subject Indian imports are not being restrained by the order, the current level of capacity utilization at the Indian foundries does not bear on the likely volume of shipments to the U.S. if the order is revoked.

The record does not show that prices of subject imports from India had a significant effect on domestic prices during the period examined. In this regard, . . . the Indian government Export Promotion Council maintains a price floor for exports to ensure fair market prices (and the antidumping duty order for India was revoked). More important, perhaps reflecting these price floors, our pricing data show that while subject Indian import prices generally were stable throughout the period examined, domestic prices fluctuated significantly. These data suggest that domestic prices were not adversely affected by the relative levels of subject Indian import prices. To some extent, the underselling by subject Indian producers can be explained by the fact that the quality of much of that product is perceived to be inferior to the domestic product. Indeed, if the products were generally comparable, one would expect that widespread underselling would result in increased import volume and market penetration, not the declining volume and share experienced by subject imports from India at

the end of the period examined.  In sum, I find that subject Indian import volume and prices have been largely unaffected by the existing order and are likely to continue to be stable if the order is revoked.

In light of the fact that the Commission received no responses from respondent interested parties regarding the reviews on heavy metal castings from China, Brazil, and Canada, the analysis of the conditions of competition concerning those subject imports must, of necessity, be based principally on the best information available in the record.  The record evidence leads me to conclude that the conditions of competition among those subject countries would be quite similar, and distinct from those relating to subject imports from India.  Those three subject countries are all restrained to a significant degree by the respective antidumping duty orders and the Commerce Department has determined that all are likely to have significant dumping margins in the event of revocation.  Thus, in stark contrast to the subject imports from India, the existing orders have effectively eliminated or, in the case of Canada, severely curtailed subject imports from those countries.  For this reason, as discussed in the Commission's opinion in which I join, the enormous capacity and substantial excess capacity in those three countries leads me to conclude that subject imports from those countries are all likely to face the same conditions of competition upon revocation of the respective orders.  As a result, unlike subject imports from India, I find that removal of the existing orders covering subject merchandise from China, Brazil, and Canada would result in substantial changes in the volume of subject imports from those countries.

In addition, unlike subject imports from India, subject imports from China, Brazil, and Canada are not covered by stable minimum price floors. Accordingly, the record indicates that prices for subject imports from those three countries are likely to fluctuate to a significant degree if the respective orders are revoked. Finally, unlike subject imports from India, the record does not contain any indication that the quality of heavy metal castings produced in China, Brazil, or Canada differs significantly from that produced by the domestic industry.[1]

(1)

---

[1] USITC Pub. 3247, pp. 29-31 (footnotes omitted).  Imports from China, Brazil and Canada were covered by antidumping-duty orders, ergo the commissioner's references thereto.

Whether such analysis in the context of cumulation was an abuse of discretion is the primary issue now before the court. To begin with, while URAA added sunset reviews to the Trade Agreements Act in 1994, cumulation predates that moment. In fact, before any statutory provision, the ITC had discretion in determining whether to cumulate data on volume and effects of subject imports from different countries. See, e.g., Lone Star Steel Co. v. United States, 10 CIT 731, 734, 650 F.Supp. 183, 186 (1986). Its approach was simply to cumulate "where the conditions of trade so warrant[ed]". USX Corp. v. United States, 11 CIT 82, 87, 655 F.Supp. 487, 491 (1987). Hence, where one nation's exports developed trends in the U.S. market that were distinct from the market patterns of other countries' competing exports, a decision not to cumulate was justified. See, e.g., id. But caselaw also established that the ITC could not engage in "a process of circular reasoning that renders cumulation a vestigial part of the causation analysis." Id., 11 CIT at 88, 655 F.Supp. at 493. In other words, it was an abuse of discretion to rely on coincident reasoning in declining to cumulate while reaching a negative material-injury determination because cumulation is based on the proposition that unfair imports from one country, while not necessarily an independent cause of material injury, can contribute to such injury when viewed in combination with subject imports from other countries.

The Trade and Tariff Act of 1984, Pub. L. No. 98-573,

§612(a)(2), 98 Stat. 2948, 3033 (Oct. 30, 1984), established a
guideline for ITC cumulation in material-injury investigations, to
wit, when subject imports compete with each other and with like
products of the domestic industry in the U.S. market.  This
criterion was added in committee, replacing a requirement in the
original bill that the imports have a contributing effect in
causing, or threatening to cause, material injury.  <u>See</u> H.R. Rep.
No. 98-725, p. 37 (1984):

> . . . [C]umulation is based on the sound principle of
> preventing material injury which comes about by virtue of
> several simultaneous unfair acts or practices. The
> Committee amended the criteria to permit cumulation of
> imports from various countries that each account individ-
> ually for a very small percentage of total market
> penetration, but when combined may cause material injury.
> The requirement in the bill as introduced that imports
> from each country have a "contributing effect" in causing
> material injury would have precluded cumulation in cases
> where the impact of imports from each source treated
> individually is minimal but the combined impact is
> injurious.

Although Congress continued to refine the standards for cumulation,
the intent of the various provisions remained the same, namely, to
address the fact that

> competition from unfairly traded imports from several
> countries simultaneously often has a hammering effect on
> the domestic industry.  This hammering effect may not be
> adequately addressed if the impact of the imports are
> [<u>sic</u>] analyzed separately on the basis of their country
> of origin.  The cumulation requirement is thus an effort
> to make the application of the injury analysis more
> realistic in terms of recognizing the actual effects of
> unfair import competition.

H.R. Rep. No. 100-40, part 1, at 130 (1987).  Similarly, URAA recognized cumulation as "a critical component of U.S. antidumping and countervailing duty law", reiterating that "a domestic industry can be injured by a particular volume of imports and their effects regardless of whether those imports come from one source or many sources."  H.R. Doc. No. 103-316, vol. I, at 847 (1994).

Although a sunset review may be a "brand new animal"[2], as the intervenor-defendants postulate, the statute and its legislative history nowhere suggest that the underlying purpose of cumulation has changed.  That is, while

> the sunset inquiry is different from a present injury inquiry -- asking whether injury is likely to continue or recur if an order is revoked rather than asking whether imports cause present injury or the threat thereof -- the "hammering effect" or likely hammering effect of imports, whether from one source or many sources, is still the same.  In an original investigation, the Commission cumulates imports to ensure that it addresses injury caused collectively by multiple import sources, even if those sources on an individual basis are not causing injury.  In a sunset review, the Commission cumulates imports to ensure that it prevents the likely continuation or recurrence of injury caused by the revocation of orders against multiple import sources, even if revocation of an order against a single import source would not be likely to cause injury.

Plaintiffs' Reply Brief, p. 14 (emphasis in original).

Neither URAA nor its legislative history offers guidance as to the factors the ITC is to consider in exercising discretion to cumulate in sunset reviews.  Since the underlying purpose of cumulation has not changed, however, caselaw covering discretionary

---

[2] Defendants-Intervenors' Memorandum in Opposition, pp. 7, 8, 13, 23.

cumulation is of moment.  Most notably, the courts have considered it an abuse of discretion to engage in circular analysis, relying on the same factors for refusal to cumulate as for an ultimate negative injury determination.  Such an approach thwarted congressional intent in that it demanded demonstrated, independent causation of material injury before any consideration of cumulation.  In USX Corp. v. United States, supra, for example, it was not the reliance on volume and price trends *per se* in considering cumulation that required remand, rather the problem was that the ITC had not sufficiently analyzed whether those differing trends reflected actual differences in the way that the imports affected the domestic market.  There was at least a possibility that the differing trends therein had been caused by the initiation of the administrative proceedings themselves and ITA subsequent orders to suspend liquidation.  However, as the court confirmed after remand, differing trends which reflect actual differences in the way imports from various countries affect the domestic market "alone may justify a decision not to cumulate".  USX Corp. v. United States, 12 CIT at 205, 220-21, 682 F.Supp. 60, 74 (1988).

While the court did also find the ITC's initial analysis circular in part in USX Corp., the finding was based on the agency's reference to lack of confirmed lost sales and revenue in the U.S. market as the basis for both declining to cumulate subject imports from Argentina and finding no material injury, not because of the comparison of volume and market-share trends.  That is not

to say that circularity can never be a problem where differences in volume, price and market share are at issue.  The distinction is a narrow but important one, hinging on trends as opposed to absolutes.  In one case upholding the ITC's refusal to cumulate based on differing volume and market-share trends, the court explained that, if the Commission

> majority had listed small volume or market share as its reason for not cumulating, the validity of the legal basis on which it rests its decision would be debatable. Here, however, rather than <u>just</u> absolute levels, numerous trends . . . reveal significant differences in the effects of Argentine and Spanish imports.  . . . In this case, cumulation of data would obscure significant differences in trends.  Prior to the effective date of the 1984 statutory amendment, ITC could consider this type of data in making its discretionary determination on cumulation.

<u>Lone Star Steel Co. v. United States</u>, 10 CIT at 735, 650 F.Supp. at 187 (emphasis added).  Thus, while comparing trends inherently involves consideration of the underlying elements, that consideration itself does not make the analysis circular.

Similar reasoning has been followed with regard to discretionary cumulation in threat-of-material-injury cases:

> The court views cumulative analysis for threat purposes as feasible in certain circumstances.  For example, if imports are increasing at similar rates in the same markets and have relatively similar margins of underselling, it is likely that cumulation could be undertaken.  This does not mean that each country's imports need threaten injury by themselves. Separately, none of them might threaten injury.  Whether cumulative analysis is actually feasible in various circumstances is left to the ITC to decide in other cases.  Here, ITC found great disparity in the patterns of volume increases and decreases among imports from the various countries. The court does not read ITC's references to Colombian market share versus that of other countries as indicating

application of an improper contributing effects test. Colombian exports were simply on a totally different plane from those of other countries in terms of market share, volume trends and otherwise. Finally, ITC notes that patterns of underselling, or lack thereof, varied greatly from one country to the next. Thus, price effects analysis on a cumulative basis would be difficult. . . .

Asociacion Colombiana de Exportadores de Flores v. United States, 12 CIT 1174, 1178, 704 F.Supp. 1068, 1072 (1988).

Under 19 U.S.C. §1675a, supra, the ITC is both given discretion to cumulate and required to consider whether material injury is likely to continue or recur in the event of revocation. In the likelihood determination, the agency must consider "the likely volume, price effect, and impact of the imports of the subject merchandise on the industry if the order is revoked", taking into account, among other things, its prior injury determination(s). Thus, by definition, the causation inquiry in sunset reviews will involve recalling the past in attempting to predict future trends.

While import trends will therefore play a role in both causation and cumulation analyses in sunset reviews, such trends are considered for different purposes, and, despite plaintiffs' arguments to the contrary, the problem of circularity is avoided. For example, in a discretionary cumulation inquiry, the ITC examines differences in current or likely volume or market-share trends between exporting countries, which would justify a decision not to exercise such discretion according to the aforementioned

caselaw. However, in the likelihood determination, the ITC must then use trends to consider

> whether the likely volume of imports of the subject merchandise would be significant if the order is revoked or the suspended investigation is terminated, either in absolute terms or relative to production or consumption in the United States.

19 U.S.C. §1675a(a)(2).

The consideration of trends in re cumulation is not the equivalent of an injury analysis thereof. For example, in a case where exports from only one country are likely to exhibit increased volume and price effects in the event of revocation, but trends for imports from each of the other countries under an ITA order are likely to be negligible, the ITC would be justified in deciding not to cumulate imports from the first country with those from the others. However, cumulation of imports from the countries with relatively-small likely volume and price impact would not only be appropriate, a refusal to do so without some additional justification could constitute an abuse of discretion. Thus, a comparison of trends does not, as the plaintiffs assert, ask the ultimate, individual-country causation question as a predicate to cumulation "in a way that precludes consideration of this question on a cumulative basis".

(2)

In Commissioner Koplan's analysis, supra, there was likewise no preclusion of cumulation; there were simply no other

countries from which subject imports had had, or were likely to have, volume and price trends similar to those of imports from India.  In other words, Indian imports were on a different plane from those of the other countries in terms of likely trends in market share, volume, and price effects.  See, e.g., USITC Pub. 3247, Table I-7 and Fig. E-1.  Thus, the court cannot and does not conclude that Commissioner Koplan's foregoing analysis amounted to an abuse of discretion or otherwise was not in accordance with law.

C

As recited above, 19 U.S.C §1675a(a)(7) precludes cumulation of the volume and effects of imports of the subject merchandise when the ITC determines that such imports are likely to have "no discernible adverse impact" on the domestic industry. Commissioner Askey concluded, as one of the ITC majority in this matter, that revocation of the order with respect to India would have no discernible adverse impact upon the U.S. industry. USITC Pub. 3247, p. 14.  She appended a footnote expressing her individual views regarding the proper analysis of this issue:

> . . . [T]he language of section 752(a)(7) . . . clearly states that the [ITC] has the discretion to cumulate subject imports for purposes of its sunset analysis, as long as the statutory requirement of competition between the subject countries and the domestic like product is satisfied.  Section 752(a)(7) also clearly states, however, that the [ITC] is <u>precluded</u> from exercising this discretion if the imports from a country subject to review are likely to have "no discernible adverse impact on the domestic industry" upon revocation of the order. . . . Thus, under this provision, the [ITC] must find that the subject imports from a country will have a "discernible adverse <u>impact on the domestic industry</u>"

> after revocation of the order before cumulating those imports with other subject imports. Accordingly, the [ITC]'s task under this provision is a straightforward one. To determine whether the Commission is precluded from cumulating subject imports from a particular country, the [ITC] must focus on how significantly the imports will impact the condition of the industry as a result of revocation, and not simply on whether there will be a small volume of imports after revocation, i.e., by assessing their negligibility after revocation of the order. If the impact of the imports is not discernible, then the [ITC] is precluded from cumulating those imports with other subject imports. . . .

Id. at 10-11, n. 52 (emphasis in original, citation omitted). The plaintiffs object to this stated approach. First, they contend that the statute does not require imports to have a discernible adverse impact in order *to* cumulate and that requiring such a showing is materially different than requiring a showing of *no* discernible adverse impact in order *not to* cumulate. The court cannot, and therefore does not, concur.

When the ITC considers whether subject imports are likely to have no discernible adverse impact, the result of the inquiry will be either negative or affirmative. Logic and grammar indicate that a negative finding is that such imports will have a discernible adverse impact. Commissioner Askey's footnote merely breaks down the language of the requisite analysis into simple steps. Hence, an affirmative finding of discernible impact is only part of the answer to the question of whether cumulation is precluded. In other words, the first question is whether the imports are likely to have any such impact. If not, the ITC is precluded from cumu-

lating.  If yes, then the question remains whether that impact is also adverse. If affirmative, the agency is permitted to cumulate; if negative, cumulation is not permissible since any impact is not both discernible and adverse.  In short, the court concludes that Commissioner Askey reasonably restated the standard for analysis, rather than changed it or "entirely dismantled the statute as written by Congress".  Plaintiffs' Rule 56.2 Brief, p. 36.

Plaintiffs' second objection to the commissioner's analysis is that she

> considered as part of her cumulation analysis the critical question of whether <u>revocation</u> would have a discernible adverse impact on the U.S. industry . . . rather than whether <u>the imports under review</u> would have no discernible adverse impact.

<u>Id</u>. at 38 (emphasis in original).  The court finds that that analysis, on its face, refutes such a claim.  Most notably, Commissioner Askey joined the majority in stating that the no-discernible-adverse-impact analysis "is focused on subject imports and the likely impact of those imports on the domestic industry within a reasonably foreseeable time if the order is revoked." USITC Pub. 3247, p. 10 (footnotes omitted). Moreover, her footnote 52, quoted above, does have references to the impact of "the imports" in the event of revocation.  While Commissioner Askey has indeed considered such impact "upon" or "in the event of" revocation, this is clearly the proper context of the inquiry.  As the defendant explains in its papers,

the statute's reference to whether the imports "are like-
ly" to have no discernible adverse impact on the domestic
industry is clearly parallel to the ultimate question
"whether revocation of the countervailing or antidumping
duty order . . . would be likely to lead to continuation
or recurrence of . . . material injury."  Both, then,
express the Congressional intent that the Commission is
to focus on changes, if any, that likely will occur if
revocation were to take place . . ..

Defendant International Trade Commission's Opposition, pp. 31-32
(emphasis in original).  *Accord* Defendants-Intervenors' Memorandum
in Opposition, p. 35.  On its face, Commissioner Askey's analysis
demonstrates that she was not analyzing the impact of revocation in
general but of "the subject imports from a country . . . after
revocation of the order before cumulating those imports with other
subject imports."  USITC Pub. 3247, p. 10, n. 52.

Finally, the plaintiffs assert that the commissioner's
interpretation contradicts Congress's intent that the "no discern-
ible adverse impact" provision be limited to an analysis of import
volume.  Plaintiffs' Rule 56.2 Brief, p. 38.  As the language of
the statute and its legislative history show, that was not the
intent of Congress.  Presumably, if it had intended that the ITC
consider only import volume in deciding whether cumulation was
precluded, it would have so restricted its enactment.  It did not.
Congress chose "no discernible adverse impact", and *impact* in the
context of U.S. unfair trade law, by any definition, encompasses
more than volume of imports.  The reason for this choice was
reported as follows:

> . . . The Committee believes that it is appropriate to preclude cumulation where imports are likely to be negligible. However, the Committee does not believe that it is appropriate to adopt a strict numerical test for determining negligibility because of the extraordinary difficulty in projecting import volumes into the future with precision. Accordingly, the Committee believes that the "no discernible adverse impact" standard is appropriate in sunset reviews.

S. Rep. No. 103-412, p. 51 (1994).

The plaintiffs interpret this language to mean that no discernible adverse impact "is equivalent to negligibility, which, in turn, equates to import volumes." Plaintiffs' Rule 56.2 Brief, p. 39. The concept of negligibility arises from a previous statutory provision, 19 U.S.C. §1677(7)(C)(v), which was in effect prior to enactment of URAA. At that time, cumulation was mandatory in present-material-injury determinations for subject imports in competition with each other and with the domestic like product. Section 1677(7)(C)(v) granted the ITC discretion not to cumulate imports that it found to be "negligible" and having "no discernible adverse impact". Thus, the concept was originally applied as an exception to mandatory cumulation -- a grant of discretion not to cumulate -- whereas in sunset reviews the same principle now operates to preclude cumulation which would otherwise be discretionary.

The above-quoted URAA legislative history does analogize the no-discernible-adverse-impact standard to negligibility.

However, in discussing this change in the law, the plaintiffs seem to overlook the fact that the 1994 Senate report distinguishes negligibility from import volumes in the context of sunset cumulation, rather than equating the two. It rejects "a strict numerical test" in order to avoid "the extraordinary difficulty in projecting import volumes into the future with precision". Again, even under the former statute, negligibility encompassed more than just import volumes. The ITC was required to evaluate "all relevant economic factors regarding the imports", including volume and market share, whether sales transactions involving the imports are isolated and sporadic, and price sensitivity of the domestic market. 19 U.S.C. §1677(7)(C)(v)(I)-(III) (1994). Thus, the court cannot concur in plaintiffs' assertion that negligibility equates only to import volume in this context. In the light of the sunset cumulation provision and its relevant legislative history, the court cannot hold that Commissioner Askey's interpretation was not in accordance with law.

                                    D

        The plaintiffs complain that Commissioner Crawford's analysis of cumulation lacked adequate explanation and was thus contrary to law.[3] Although her overall approach to cumulation may

_____

        [3] This claim was initially made in reference to the commissioner's analysis of India, China and Brazil. See Plaintiffs' Rule 56.2 Brief, p. 40. The court addresses the argument only as it relates to Indian subject imports, as the ITC's determinations regarding China and Brazil are not at issue in this

                                            (footnote continued)

be unique[4], the commissioner recognizes that the "statute clearly prohibits cumulation where the subject imports are likely to have no discernible adverse impact on the domestic industry."  USITC Pub. 3247, p. 42.  As evidenced by a notation to the majority Views and her individual views, Commissioner Crawford stood with the majority in determining that revocation of the existing counter-vailing-duty order covering subject imports of heavy castings from India likely would have no discernible adverse impact on the domestic industry.  See id. at 3, n. 2 and at 42-43.  Consequently, she concluded that the statute precluded cumulation of the subject imports from India with those from the other countries.  See id. at 43.  Given that the commissioner clearly joined in section III.C.1. of the majority Views regarding no-discernible-adverse impact, the court does not consider the remainder of her individual analysis to be actionable, as the plaintiffs pray.

---

matter.  The other countries were purportedly included "to illustrate the totality of the shortcomings" in Commissioner Crawford's written explanation regarding cumulation, "not as an independent claim for relief."  Plaintiffs' Reply Brief, p. 28.

   [4]  Commissioner Crawford describes her approach as a "se-quential, four-step analytical process that addresses eligibility for cumulation, statutory prohibition, Commission discretion, and competition."  USITC Pub. 3247, p. 41.  The court notes a discrepancy in the cited result of her "eligibility" inquiry in this matter.  Compare id. at 42 with id. at 13, n. 63.  However, the court considers it to be harmless because the commissioner's steps are sequential, and the next one found that cumulation was precluded with regard to India.  This conclusion mooted any issue raised by the discrepancy as to which countries' imports, if any, might have been cumulated with subject imports from India.

II

The plaintiffs take the position that, if the companion appeal from the ITA's sunset determination were to result in affirmative judicial relief, the court should remand this action to the ITC for consideration of the other agency's amended results.

Initially, the court agrees that there can be interrelation between the subsidy rates and the ITC's determination. Indeed, the statute provides that, in

> making a determination under section 1675(b) or (c) of this title, the Commission may consider the magnitude of the margin of dumping or the magnitude of the net countervailable subsidy.

19 U.S.C. §1675a(a)(6). And the commissioners, including those writing in dissent, exercised this discretion, noting that the ITA found that the likely countervailable subsidy upon revocation would range from 0.84 percent to 1.82 percent for imports from India. See USITC Pub. 3247, pp. 13, 29 and 38, n. 26.

Notwithstanding the relationship between the determinations of Commerce and the Commission, counsel for the latter assert that

> remand would not be appropriate even if the margins were to change as a result of the separate court action. The statute and Statement of Administrative Action . . . accompanying the URAA make clear that, even in the context of the Commission's mandatory consideration of margins in the antidumping context . . ., the Commission is not to reconsider its determination if Commerce changes margins upon which the Commission has relied:

> For other investigations for which cumulation is appropriate, the Commission is to use the most recent dumping margin issued by Commerce at the time the Commission closes the record. This precludes challenges to a Commission determination on the basis that Commerce later modifies the original dumping margin.
>
> Changes in the original margin could occur due to further proceedings in staggered investigations, corrections of ministerial errors, reconsideration of a determination, or <u>judicial remand</u>. Absent this provision, Commission determinations could be subject to repeated requests for reconsideration or judicial remands. The finality of injury determinations would be seriously compromised if the Commission were required to amend or revisit its determination each time the administering authority revised its dumping margin.

H.Doc. No. 103-316 at 851 (1994) (emphasis added). . . . Although this SAA discussion relates only to cases in which the Commission has considered antidumping duty margins, there is every reason to view it as equally applicable when the margins relied on are countervailing duty margins. Whereas the Antidumping Agreement that resulted from the Uruguay Round of trade negotiations, and thus U.S. implementing law (19 U.S.C. §1677(35)) require consideration of the magnitude of dumping margins, the Subsidy Agreement from the Round, and thus U.S. implementing law, do not require the Commission to consider the rate of subsidization. . . . The discussion in the SAA therefore relates specifically only to dumping margins. . . . [T]here would be no rational basis to require a remand to the Commission when countervailing duty margins change by court remand, when such change in the very margins the Commission is required to consider, dumping margins, is not to be followed by a remand to the Commission.

Defendant International Trade Commission's Opposition, pp. 42-43

(citation omitted).

Be this reasoning as it may, the court is not at liberty to excuse automatically ITC reconsideration of subsidy rates developed during countervailing-duty sunset reviews pursuant to 19 U.S.C. §1675a[5]. That only Congress can do. In any event, the results of this court's remand of related case No. 99-07-00441 to the ITA do not entail different rates, and they have now been affirmed by the court. See Neenah Foundry Co. v. United States, 25 CIT ___, ___ F.Supp.2d ___, Slip Op. 01-74 (June 20, 2001). Thus, plaintiffs' contingent claim for relief herein is now moot.

---

[5] Cf. 28 U.S.C. §2643(c)(1). In fact, while not in the context of a sunset review, the Court of International Trade and the Court of Appeals for the Federal Circuit have addressed the question of a remand to the ITC when dumping margins calculated by the ITA change. In Borlem S.A.ВEpreedimentos Industriais v. United States, 13 CIT 535, 718 F.Supp. 41 (1989), aff'd, 913 F.2d 933 (Fed.Cir. 1990), for example, a recalculation of the dumping from the two respondent countries resulted in one margin's changing from approximately 20 percent to de minimis and thereby being excluded from the order after the ITC had issued an affirmative injury determination. The CIT directed the Commission on remand to reconsider its determination in light of that change, and the Federal Circuit affirmed the agency's authority to do so.

Subsequent cases have pointed out that the remand in Borlem was based on the fact that the change was "of such substantial significance that the ITC might well have changed its determination". Nippon Steel Corp. v. United States, 19 CIT 450, 467 (1995). They have sought to make clear that Borlem "does not stand for the broad proposition that ITC must reconsider a final determination based upon affirmative [dumping] margins that later change." Id. That is, the Commission need not reconsider its determination where it does not "appear the ITC made its finding of injury based upon material and significant inaccurate facts." Saarstahl AG v. United States, 18 CIT 595, 597, 858 F.Supp. 196, 198 (1994)(quoting Borlem, 13 CIT at 541, 718 F.Supp. at 46), rev'd on other grounds, 78 F.3d 1539 (Fed.Cir. 1996).

III

In view of the foregoing, plaintiffs' motion for judgment upon the agency record must be denied[6] and this action dismissed. Judgment will enter accordingly.

So ordered.

Decided:  New York, New York
          June 25, 2001

_____
                               Judge

---

[6] Plaintiffs' Consent Motion for Oral Argument also can be denied, given the quality of their written submissions, as well as of the papers filed in opposition.