**Slip Op. 03-118**

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| USINOR INDUSTEEL, S.A., DUFERCO CLABECQ, S.A., AG der DILLINGER HÜTTENWERKE, SALZGITTER AG STAHL und TECHNOLOGIE, and THYSSEN KRUPP STAHL AG, | : : : : : | |
| Plaintiffs, | : : | |
| v. | : : | Consolidated Court No. 01-00006 |
| THE UNITED STATES, | : : | **Public Version** |
| Defendant, | : : | |
| and | : : | |
| BETHLEHEM STEEL CORPORATION and U.S. STEEL GROUP, A UNIT OF USX CORP., | : : : | |
| Defendant-Intervenors. | : : | |

[ITC Second Remand Determination sustained.]

Dated: September 8, 2003

Barnes, Richardson, & Colburn (Gunter von Conrad and Stephen W. Brophy) and DeKiefer and Horgan (James Kevin Horgan) for plaintiff Usinor Industeel, S.A.

White and Case LLP (Walter J. Spak, Lyle B. Vander Schaaf, Frank H. Morgan, Joseph H. Heckendorn and Corey Norton) for plaintiff Duferco Clabecq, S.A.

DeKieffer and Horgan (Marc E. Montalbine and Merritt R. Blakeslee) for plaintiffs AG der Dillinger Hüttenwerke, Salzgitter AG Stahl und Technologie and Thyssen Krupp Stahl AG.

Lyn M. Schlitt, General Counsel, James M. Lyons, Deputy General Counsel, United States International Trade Commission (Rhonda M. Hughes and Michael Diehl) for defendant.

Dewey Ballantine LLP (Alan Wm. Wolff, Kevin M. Dempsey and Rory F. Quirk) and Skadden, Arps, Slate, Meagher & Flom LLP (Robert E. Lighthizer, John J. Mangan, and James C. Hecht) for defendant-intervenors Bethlehem Steel Corporation and U.S. Steel Group, a unit of USX Corporation.

**OPINION**

**RESTANI, Judge:** This matter is before the court following a series of decisions regarding the final determination of the United States International Trade Commission ("Commission" or "ITC") in its five-year sunset review of antidumping and countervailing duty orders on cut-to-length carbon steel plate ("CTL plate") in Certain Carbon Steel Products From Australia, Belgium, Brazil, Canada, Finland, France, Germany, Japan, Korea, Mexico, Netherlands, Poland, Romania, Spain, Sweden, Taiwan, and United Kingdom, 65 Fed. Reg. 75,301 (Int'l Trade Comm'n 2000) [hereinafter Final Determination]. See, e.g., Usinor Industeel, S.A. v. United States, No. 01-00006, Slip Op. 02-39 (Ct. Int'l Trade Apr. 29, 2002) ("Usinor I") (finding, inter alia, that the ITC had not applied the proper "likelihood of material injury" standard under 19 U.S.C. § 1675a(a) in conducting its sunset review analysis and remanding for further explanation regarding changes in the European Union ("EU")); Usinor Industeel, S.A. v. United States, No. 01-00006, Slip Op. 02-75 (Ct. Int'l Trade July 30, 2002) ("Usinor II") (denying the ITC's motion to certify the "likelihood of material injury" issue for interlocutory appeal). Familiarity with those decisions is presumed.

In Usinor Industeel, S.A. v. United States, No. 01-00006, Slip Op. 02-152 (Ct. Int'l Trade Dec. 20, 2002) ("Usinor III"), the court largely sustained the Commission's remand determination; but, in the light of Duferco Steel, Inc. v. United States, 296 F.3d 1087 (Fed. Cir. 2002) (excluding floor plate from the scope of this investigation), the court remanded the matter

to the Commission to "recalculate its findings regarding capacity, production, and export orientation without consideration of floor plate data." Usinor III, Slip Op. 02-152 at 9. The essential issues on remand were (1) whether, in view of Duferco, Belgian imports should continue to be cumulated with other imports from other subject countries pursuant to 19 U.S.C. § 1675a(a)(7); and (2) whether the absence of floor plate has an impact on the Commission's overall analysis after cumulation.

In its second remand determination, the Commission concluded again, that despite the absence of floor plate data, subject imports from Belgium were not likely to have no discernible adverse impact on the domestic industry if the orders were revoked and again elected to include Belgium in its cumulated analysis. As to its overall determination, the Commission determined that the exclusion of floor plate from the scope did not change the record significantly and adopted its findings from the original Final Determination and First Remand Determination. Plaintiffs Usinor Industeel, S.A. ("Usinor") and Duferco Clabecq, S.A. ("Duferco") contest the Commission's March 12, 2003 Second Remand Determination.

## DISCUSSION

In the context of sunset review, the ITC must "determine whether revocation of an order, or termination of a suspended investigation, would be likely to lead to continuation or recurrence of material injury within a reasonably foreseeable time." 19 U.S.C. § 1675a(a)(1) (2003).[1] In

---

[1] The full text of 19 U.S.C. § 1675a(a)(7) reads:

For purposes of this subsection, the Commission may cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which reviews under section 1675(b) or (c) of this title were initiated on the same day, if such imports would be likely to compete with each other and with domestic like products in the United States market. The Commission shall not

determining the likelihood of continuation or recurrence of material injury "the Commission may cumulatively assess the volume and effect of imports of the subject merchandise from all countries . . . if such imports would be likely to compete with each other and with domestic like products in the United States market." 19 U.S.C. § 1675a(a)(7) (2003).  The Commission may not cumulate if it finds that imports from a particular country "are likely to have no discernible adverse impact on the domestic industry."  Id.[2]

In both the initial Final Determination and First Remand Determination, the Commission cumulated the likely volume and effect of subject imports from eleven (11) countries, including Belgium.[3]  In the interim, the Court of Appeals for the Federal Circuit ("CAFC") found that Commerce improperly interpreted its 1993 final scope orders to include floor plate.  Duferco Steel, 296 F.3d at 1098.  It is undisputed that the ITC treated floor plate as subject merchandise in its Final Determination and First Remand Determination.  Staff Report at Plate-II-9.  Because [    ] of Belgium's subject imports during the period of review ("POR") were floor plate, the court again remanded the matter to the ITC to review both its decision to cumulate as well as its larger likelihood of material injury determination —  without consideration of floor plate.

_____

cumulatively assess the volume and effects of imports of the subject merchandise in a case in which it determines that such imports are likely to have no discernible adverse impact on the domestic industry.

[2]  Plaintiffs argue the statute permits cumulation "only when certain conditions are met." Duferco Br. at 2.  A better summary description of the statute would be that the Commission has discretion to cumulate unless certain limited conditions occur.

[3]  The ITC did not cumulate subject imports from Canada because it found significant differences in conditions of competition with respect to Canadian CTL plate.  Final Determination at 22–23; First Remand Determination at 15.  The ITC's decision to exclude Canadian subject imports is not challenged here.

Upon remand, the Commission reopened the administrative record, requested specific

information from the Belgian producers pertaining to CTL plate exclusive of floor plate, and

permitted the parties to comment on the data.  The court notes from the outset that the

Commission concedes that there were [          ] U.S. imports of subject plate from Belgium

during the POR.  Second Remand Determination at 3.  Nevertheless, the Commission concluded

that the removal of floor plate data did not "change the overall body of data significantly, as floor

plate accounted for a very small share of overall Belgian plate production and shipments" during

the original investigation and relevant period of review.  Id.  As such, the Commission again

cumulated subject imports from eleven (11) countries, including Belgium, and made an

affirmative likely injury determination in this review.  Plaintiffs challenge both.

I.       **Cumulation**

         A.       **No Discernible Adverse Impact**

In challenging the Commission's decision to cumulate subject imports from Belgium

with those from other countries, Plaintiffs first dispute the Commission's determination that it

cannot find that there would likely be no discernible adverse impact upon revocation of the

antidumping and countervailing duty orders.[4]  As discussed in Usinor I, there is no statutory

provision enumerating the factors to be considered in determining whether subject imports from

a particular country are likely to have no discernible impact.  Usinor I, Slip Op. 02-39 at 9–10.

The Statement of Administrative Action ("SAA") accompanying H.R.Rep. No. 103-826(I), at

---

[4]  The court notes that while Plaintiffs again contend that the Commission has not applied
the proper likelihood of material injury standard in this case, what Plaintiffs actually argue is that
there is insufficient evidence to support the Commission's findings under the correct standard.
At this point, all parties are clear on the standard and the court will not again address the matter.

887, reprinted in 1994 U.S.C.C.A.N. 4040, 4212, issued in connection with the Uruguay Round

Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994), is equally silent.  In the

absence of specific guidance from Congress, the Commission generally considers "likely volume

of the subject imports and likely impact of those imports on the domestic industry within a

reasonably foreseeable time."  Usinor II, Slip Op. 02-75 at 5 (quoting Final Determination at 22).

The Commission considers these factors in the context of the prevalent conditions of

competition.[5]

Throughout their objections to the Second Remand Determination, Plaintiffs repeatedly

challenge the Commission's findings regarding likely volume.  Because the Commission cannot

cumulate if it finds there likely will be no discernible adverse impact and because the

Commission has looked at likely volume, Plaintiffs have mistakenly concluded that the

Commission must provide substantial evidence to prove that significant volume is likely.  See

Duferco Br. at 7.  Put another way, Plaintiffs seem to argue that the same evidence necessary to

support an overall affirmative likelihood of material injury finding is required in order to

cumulate.  The government argues that it need not show significant volume because "even

modest volumes can result in a discernible adverse impact given the weakened state of the

---

[5] With respect to the conditions of competition relevant here, the Commission found that (1) subject imports from Belgium would be substitutable for, and competitive with, domestically produced plate; (2) CTL plate is a commodity product that competes primarily on the basis of price; and (3) there has been a consolidation in the number of steel service centers, which resulted in their gaining increased pricing leverage, thus increasing the likelihood they would make large import purchases of subject plate in the absence of discipline.  The Commission concluded that, under these conditions, even a modest volume of subject imports from Belgium would have a discernible adverse impact.  Second Remand Determination.

domestic industry." Gov't Br. at 17.[6]  The court agrees.

An adverse impact, or harm, can be discernible but not rise to a level sufficient to cause material injury.[7]  The different standards reflect the nature of the cumulation analysis.  Certain imports are to be cumulated to assess causation of material injury, but the no "discernible impact" provision provides a safe harbor of sorts for certain imports viewed in isolation.  See, e.g., Neenah Foundry Co. v. United States, 155 F. Supp. 2d 766, 772-73 (Ct. Int'l Trade 2001).  Plaintiffs' theory would defeat the purpose of cumulation, i.e., to guard against the "hammering" effect of imports which, in isolation, do not cause material injury.  Id. at 773.  As such, the substantial evidence necessary to support an affirmative material injury determination is greater than that necessary to find there will not likely be no discernible adverse impact from imports of a particular country.  Consequently, Plaintiffs' argument that the Commission has failed to provide substantial evidence of likely "significant" volume is not determinative as the Commission is not required to make such a showing of a particular level of imports, e.g., the level needed for a material injury analysis.[8]

Nevertheless, the Commission has looked at likely volume as it relates to "no discernible

_____

[6]  Plaintiffs do not contest that the domestic industry was in a weakened state.

[7]  "The term 'material injury' means harm which is not inconsequential, immaterial, or unimportant."  19 U.S.C. § 1677(7)(A).

[8] The cumulation provision gives the Commission discretion to consider the effects of "imports from various countries that each account individually for a very small percentage of total market penetration, but when combined may cause material injury."  Neenah Foundry, 155 F. Supp. 2d at 771 (quoting H.R. Rep. No.  98-725, p.37 (1984)).  "[C]ompetition from unfairly traded imports from several countries simultaneously often has a hammering effect on the domestic industry [that] may . . . not be adequately addressed if the impact of the imports are analyzed separately on the basis of their country of origin."  H.R. Rep. No. 100-40, part 1, at 130 (1987).

adverse impact" and a review of its findings is required. As discussed, while the Commission need not show a particular likely volume in order to cumulate, even the Commission concedes that "the record must indicate some appreciable volume of subject imports in order for the Commission to conclude that subject imports are not likely to have no discernible adverse impact on the domestic industry." Gov't Br. at 11. In evaluating the likely volume of imports of subject plate in the larger sunset review, the Commission considers "any likely increase in production capacity or existing unused production capacity" as well as "the potential for product-shifting." 19 U.S.C. § 1675a(a)(2)(A), (D). In assessing the likely volume here, the Commission considered the size and capacity of the Belgian plate industry including its actual production of subject plate as well as similar plate products, the Belgian industry's export orientation and ability to redirect and increase production, and the weakened state of the U.S. industry.

### 1. Size and Capacity of the Belgian Producers

Although the Commission acknowledged that there were [                    ] to the U.S. during the POR, the Commission found that the Belgian producers nonetheless remain heavily dependent on subject products.[9] The Commission found that the plate capacity of the Belgian industry in 1999, the last full year of the POR, was significant compared to U.S. apparent consumption in the same year. [10] In addition, the Commission noted that Belgian capacity

---

[9] The Commission conceded that there were [                    ] from Belgium during the POR but pointed out that subject plate accounted for roughly [    ] percent of Belgian production since 1997. Second Remand Determination at 3. The Commission found that floor plate accounted for only [    ] percent of Belgium's total production of all CTL floor plate in 1998, [    ] percent in 1999, and [    ] percent in the first quarter of 2000. Staff Report at II-9.

[10] Belgian plate capacity in 1999 was [          ] short tons, or [    ] percent of the United States apparent consumption ([              ]). In 1999, Belgian capacity to produce

utilization fell steadily over the POR.[11]  The Commission found that the unused capacity in 1999

was substantial.[12]  The Commission determined that the Belgian plate industry can shift

production in both directions between subject and non-subject plate and that the Belgian industry

had allocated substantial capacity to plate products that are similar to subject plate.[13]  Based upon

the size of the Belgian industry and its capacity to produce subject and non-subject plate, the

Commission found there would likely be sufficient volumes of subject imports to negatively

impact the weakened domestic industry.

In response, Duferco argues that it cannot shift production as easily as the Commission

suggests.  Duferco argues that, because of a large standing contract for the production of [

][14] and an increased reliance upon production of high-end niche products,[15] they are unable

---

subject plate was [        ] short tons, [        ] percent of apparent U.S. consumption.  Second Remand Determination at 6 & n.15.

[11]  Belgian capacity utilization fell from [        ] percent in 1997, to [        ] percent in 1998, to [        ] percent in 1999.  Staff Report at Table II-4.  The Commission acknowledges that, in the first quarter of 2000, the Belgian operated at an unusual  [        ] percent capacity utilization but found that this anomaly was due to [                                        ] and elected to rely more heavily on the yearly data.  Second Remand Determination at 6–7.  The court finds no error in this regard.

[12]  In 1999, unused capacity to produce subject plate was more than [        ] short tons.  Id. at 6.

[13]  In 1999, the Belgian industry allocated [                ] short tons of capacity to similar but non-subject plate products.  Id. at 7.

[14]  Duferco argues that there would be substantial obstacles to shifting production to export subject plate to the United States.  Duferco contends that it has [

]
to a related company, Duferco La Louviere.  See Duferco Response to Foreign Producer Questionnaire at II-8 and II-9.  Under this contract, Duferco is to sell [                ] of slab per year to Duferco La Louviere.  See Appendix at 17.  The contract is of unlimited duration and requires six-months notice to terminate. Duferco cites this [

to make sudden shifts to produce subject plate in significant quantities. Plaintiffs also argue that the companies investigated during the period of review are essentially different companies and operate in different ways from those investigated during the original POI.[16] Plaintiffs point out that Belgian production[17] and overall capacity[18] have decreased since the original investigation. Duferco alleges that the decrease in production is a result of the restructuring of the businesses and decreased employment levels.[19] Despite Plaintiffs argument to the contrary, the Commission

---

] to show that Duferco intends to focus its sales on the EU. Duferco concedes, however that about [        ] of its capacity is not committed to long term contracts. Some contracts (usually [        ] in duration) may expire at any time. Duferco Br.

[15] According to Duferco, its management has determined that [                                                        ] See Staff Report at Plate-IV-2; see also Duferco Response to Foreign Producer Questionnaire at II-8 and II-9. Duferco argues that it has decided to [                                                                                    ]. Id.

[16] In 1997, Duferco acquired the assets of the former Forges de Clabecq operations from the Belgian government. Forges de Clabecq accounted for the vast majority of U.S. imports of Belgian plate in the 1993 investigation. Duferco argues that, since that acquisition, Duferco management has operated its mill in a substantially different manner than previous management. As such, Duferco claims not to have the business records of the old business and thus no information prior to 1998. Usinor Industeel, acquired Fabrique de Fer, since the original investigation. Staff Report at Plate-IV-1.

[17] Belgian production of subject plate decreased from [        ] short tons in 1992 to [        ] short tons in 1999, a [        ] percent reduction. According to plaintiffs, Belgian capacity to produce subject plate decreased from [        ] short tons during the POI to [        ] during the POR – a [        ] percent drop. Second Remand Determination at 6 & n.16.

[18] Belgian capacity in 1997 was [        ], [        ] in 1998, and [        ] in 1999. Staff Report at Table II-4.

[19] Duferco claims that employment levels have decreased by [        ] percent. Duferco Br. at 12.

considered this data "but remained unpersuaded" because "Belgian capacity and the nature of plate production indicate that the Belgian industry has both the ability and the incentive to increase exports of subject plate to the United States." Second Remand Determination at 6.

With regard to the increased focus on [                    ], the Commission found that "a significant percentage" of the plate produced by Duferco (the larger of the two Belgian producers) consists of [                              ]. Second Remand Determination at 10.[20] With regard to reduced capacity, as discussed, the Commission found that Belgian capacity to produce subject plate was significant in 1999, that capacity utilization "fell steadily" from 1997 to 1999, and that excess capacity to produce subject plate was substantial in 1999. Id. at 6. With regard to the ability to shift products, the Commission found that in addition to the reported capacity allocated to the production of subject plate and floor plate, the Belgian producers allocated an additional substantial capacity[21] in 1999 to the production of cut-to-length alloy steel plate, which could be shifted to the production of subject plate. Id. at 7. As to Plaintiffs' argument that Belgian producers have no incentive to sell to the U.S., the Commission points to Plaintiffs' sales of microalloy CTL plate[22] and now excluded floor plate[23] to the United States. Id. at 9. The court finds that the Commission has properly considered Plaintiffs' claims and presented sufficient evidence to support its findings.

---

[20] The Commission noted that [

] Second Remand Determination at 10.

[21] [      ] tons. Id. at 7.

[22] [        ] short tons shipped to the U.S. between 1997 and 1999. Id. at 9.

[23] [        ] short tons shipped to the U.S. between January 1998 and March 2000. Id.

### 2.    Export Orientation and Interest in the U.S. Market

Plaintiffs also challenge the Commission's finding that the CTL industry is export oriented. In the original POI, the Belgian CTL plate industry exported roughly the same percentage of subject plate as it did during the POR.[24]  In the original POI, Belgian producers shipped more subject plate to the U.S. than to their domestic market.[25]  As such, it makes some sense that export shipments of subject plate may rise to similar levels.  Plaintiffs argue that changes in their business strategy to emphasize intra-EU sales would prevent future imports to the U.S.[26]  The court has already found that the Commission has shown sufficient support to suggest future U.S. imports despite changes in the EU or sales strategies based on them. Nevertheless, in its Second Remand Determination, the Commission acknowledged that much of Belgium's exports are to the EU,[27] but found that the Belgian industry continues to show an interest in exporting similar products, such as microalloyed plates and floor plate, to the U.S.[28]

---

[24]  Belgian producers exported [      ] percent of its total plate shipments in 1992 and [   ] percent of total shipments of CTL (excluding floor plate) in 1999. Id. at 8.

[25] In 1992, [      ] percent of total Belgian shipments of plate were exported to the U.S. while [     ] percent was shipped domestically.  Between January 1998 and March 2000, Belgium shipped [       ] short tons of floor plate to the U.S., or [        ] percent of its total shipments.  Id. at 8–9.

[26]  Plaintiffs spend much time explaining how they have shifted sales to the EU and why it is likely that they will continue to ship subject plate to the EU.  The court has largely addressed this issue in Usinor III.  While there is support for Plaintiffs' position, there is also support for the Commission's and the court will not revisit the issue.

[27]  Only [     ] percent of Duferco's CTL plate is shipped outside of the EU. Id. at 8.

[28]  Microalloyed CTL is a non-subject product, but is considered by the Commission to be similar to subject product.  The Commission alleges that the production of Microalloyed CTL may be easily shifted to subject product. Between 1997 and 1999, Belgian producers shipped [    ] short tons of microalloyed cut-to-length plate to the U.S., which accounted for [     ] percent of total Belgian shipments during that period. Id. at 9.

The presence or level of subject imports during the POR, while important, is not determinative because the imposition of trade discipline "is expected to, and often does, have a significant restraining effect on the volume of subject imports." SAA, H.R. Doc. No. 103-316, vol. 1 at 883–884 (1994). The court finds that the Commission has presented sufficient evidence to support its finding that the Belgian plate industry is export oriented and has an interest in exporting its products to the United States. Overall, the court finds that the Commission has presented sufficient evidence to show that a sizeable Belgian plate industry, with substantial excess capacity to produce subject and non-subject plate products, is likely to export some subject plate to the United States if the orders are revoked and that, because of the undisputed weakened domestic industry, even modest imports would have a discernible adverse impact. As such, the court finds no error with the Commission's no discernible impact finding.

**B.      Competition Overlap**

As discussed, in order to cumulate, the Commission must find that Belgian CTL plate is "likely to compete with each other and with domestic like products in the United States market." 19 U.S.C. § 1675a(a)(7). In Usinor I , the court found that the Commission provided sufficient support for its finding that competition overlap existed. In light of Duferco, the court ordered the Commission to review its findings. The four factors considered are: (1) the degree of fungibility between the imports from different countries and between imports and the domestic like product; (2) the presence of sales or offers to sell in the same geographical markets of imports from different countries and the domestic like product; (3) the existence of common or similar channels of distribution for imports from different countries and the domestic like product; and (4) whether the imports are simultaneously present in the market. On remand, the Commission

did not alter its findings as to competition overlap because it found that floor plate made up a very small share of Belgian production[29] and thus the record did not substantially change.

Plaintiffs argue that, the Commission's findings on fungibility, geographic overlap, etc., are irrelevant without a showing of likely volume. Plaintiffs again argue that there is no evidence that Belgian producers will likely [                    ] standard subject plate to the United States.[30] As discussed, Duferco argues that there would be substantial obstacles to shifting production to export subject plate to the United States.[31] This is essentially the same argument Duferco made as to the Commission's no discernible impact finding. As discussed, the court found support for the Commission's findings of sufficient volume to show a likely discernible adverse impact. Aside from Plaintiffs' general argument of irrelevance, Plaintiffs specifically challenge only the Commission's findings on simultaneous market presence and geographic overlap.

In Usinor I, the court found that the "Commission provided sufficient support for its findings" of geographic overlap and simultaneous presence in the U.S. market. Usinor I, Slip Op. 02-39 at 16. Plaintiffs argue that, because the Commission relied upon data showing [

                    ] during the POR, the Commission must revisit that issue.

---

[29] During the POI, floor plate accounted for only [      ] percent of subject imports from Belgium in 1990, [      ] percent in 1991, and zero percent in 1992. Staff Report at III-1. During the POR floor plate accounted for [      ] percent of the Belgian industry's total production in 1998, [      ] percent of its production in 1999, and [                    ] percent of its production in the first quarter of 2000. Second Remand Determination at 10; Staff Report at II-9.

[30] As discussed, Duferco argues that it exports to the United States [

                                                                ]. See discussion supra n.15.

[31] See discussion supra n.14.

Again, Plaintiffs' argument relates back to its overall claim that the Commission has failed to show evidence of sufficient likely imports. The court has ruled otherwise. In the Second Remand Determination, the Commission found that "[i]n light of the importance of distributors/steel service centers that are dispersed throughout the United States, it is likely that subject imports from Belgium would be simultaneously present in the U.S. market as a whole and in the same geographical markets as other subject imports and the domestic like product." Second Remand Determination at 18–19. The Commission found that the exclusion of floor plate has no effect on the importance of these distribution methods. The court agrees and finds that the Commission has presented substantial evidence to support its competition overlap finding. As such, the court finds no error with the Commission's decision to cumulate subject imports from Belgium.

## II.     Likelihood of Material Injury Determination

Plaintiffs have not substantively addressed whether the absence of floor plate alters the Commission's over-all likelihood of material injury determination; rather Plaintiffs generally challenge the Commission's application of the standard, which the court has addressed. Because the absence of floor plate does not substantially change the data as to imports from Belgium, much less the cumulated data, the court finds no error with the Commission's affirmative likelihood of material injury finding.

### CONCLUSION

For the foregoing reasons, the court finds that the Commission has presented substantial evidence of the size of the Belgian industry and its capacity to produce subject and non-subject plate products as well as the Belgian industry's interest in exporting subject plate to the United

States. As such, the court finds that the Commission's finding that, upon revocation of the applicable antidumping and countervailing duty orders, subject imports from Belgium are not likely to have no discernible adverse impact on the domestic industry is supported by substantial evidence and in accordance with law. In addition, the court finds no error with the Commission's competition overlap analysis and that Plaintiffs remaining arguments, all of which are nearly identical to its "no discernible adverse impact" argument, are without merit. Accordingly, the court sustains the Second Remand Determination.

_____

Jane A. Restani
JUDGE

Dated: New York, New York

This 8th day of September, 2003