**Slip Op. 05–122**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| COGNE ACCIAI SPECIALI S.P.A. <br><br> and <br><br> COGNE SPECIALTY STEEL USA, INC., <br><br>        Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br>        Defendant, <br><br> and <br><br> CARPENTER TECHNOLOGY CORP., <br><br>        Defendant-Intervenor. | Before:  Restani, Chief Judge <br><br> Court No. 04–00411 <br><br> **PUBLIC VERSION** |

**OPINION**

[Plaintiffs' motion for judgment on the agency record regarding ITC sunset review of stainless steel wire rod denied; judgment entered for Defendant.]

Dated: September 12, 2005

Hunton & Williams LLP, (William Silverman and Richard P. Ferrin) for Plaintiffs.

James M. Lyons, General Counsel, Andrea Casson, Acting Assistant General Counsel for Litigation, Office of the General Counsel, U.S. International Trade Commission (Michael K. Haldenstein), for Defendant.

Collier Shannon Scott, PLLC, (David A. Hartquist, Laurence J. Lasoff, and Mary T. Staley) for Defendant-Intervenor.

**Restani, Chief Judge:**   Plaintiff Cogne Acciai Speciali S.P.A., an Italian producer and exporter of stainless steel wire rod ("SSWR"), and Plaintiff Cogne Specialty Steel USA, Inc., Cogne Acciai's U.S. affiliate,[1] move for judgment on the agency record, challenging the United States International Trade Commission's decision to cumulatively assess the volume and effects of Italian SSWR imports together with SSWR from other subject countries in the five-year sunset review of antidumping duty orders on SSWR.  See Stainless Steel Wire Rod from Italy, Japan, Korea, Spain, Sweden, and Taiwan, USITC Pub. 3707,  Inv. Nos. 731-TA-770-775 (July 2004) [hereinafter Final Determination (Pub.)]; ITC Confidential Views,  List 2, C.R. Doc. 854 (July 28, 2004) [hereinafter Final Determination (Conf.)]; see also Stainless Steel Wire Rod from Italy, Japan, Korea, Spain, Sweden, and Taiwan, 69 Fed. Reg. 45,077 (ITC July 28, 2004) (notice of final results of sunset review).

The ITC has discretion to cumulate imports from all countries subject to review, see 19 U.S.C. § 1675 (2004), but this discretion is qualified in part by the limitation that the ITC shall not cumulatively assess imports that "are likely to have no discernible adverse impact on the domestic industry." 19 U.S.C. § 1675a(a)(7).  Arguing that it has neither the excess capacity nor the economic incentive to export SSWR to the United States beyond a negligible level in the event the antidumping duty order is revoked, Cogne claims the ITC lacked substantial evidence for its

_____

[1]   Hereinafter, Plaintiffs are referred to collectively as "Cogne."

determination that Italian SSWR imports are likely to have a discernible adverse impact.[2] Cogne also challenges the ITC's subsequent decision to cumulate. Because the ITC's determinations are supported by substantial evidence, the motion for judgment on the agency record is denied.

**BACKGROUND**

The Final Determination concluded the ITC's sunset review of antidumping duty orders on SSWR from several countries. In the original investigation that produced the antidumping duty orders, the ITC made its material injury determination on September 1, 1998. Stainless Steel Wire Rod from Germany, Italy, Japan, Korea, Spain, Sweden, and Taiwan, USITC Pub. 3126, Inv. Nos. 701-TA-373 and 731-TA-769-775 (final) (Sept. 1998). The United States Department of Commerce then imposed the antidumping duty orders on imports from all of the countries under investigation, as well as a countervailing duty order on SSWR from Italy on September 15, 1998. Stainless Steel Wire Rod from Italy, 63 Fed. Reg. 49,327 (Dep't Commerce Sept. 15, 1998) (antidumping duty order); Stainless Steel Wire Rod from Japan, 63 Fed. Reg. 49,328 (Dep't Commerce Sept. 15, 1998); Stainless Steel Wire Rod from Korea, 63 Fed. Reg. 49,331 (Dep't Commerce Sept. 15, 1998); Stainless Steel Wire Rod from Spain, 63 Fed. Reg. 49,330 (Dep't Commerce Sept. 15, 1998); Stainless Steel Wire Rod from Sweden, 63 Fed. Reg. 49,329 (Dep't Commerce Sept. 15, 1998); Stainless Steel Wire Rod from Taiwan, 63 Fed. Reg. 49,332 (Dep't Commerce Sept. 15, 1998);

---

[2] For ease of discussion, the court refers to the ITC's determination that subject imports from Italy were not likely to have no discernible adverse impact as a finding that such imports would have a discernible impact. Rephrasing the statutory terminology used in the Final Determination does not alter its meaning: "When the ITC considers whether subject imports are likely to have no discernible adverse impact, the result of the inquiry will be either negative or affirmative. Logic and grammar indicate that a negative finding is that such imports will have a discernible adverse impact." Neenah Foundry Co. v. United States, 25 CIT 702, 712, 155 F. Supp. 2d 766, 775 (2001).

Stainless Steel Wire Rod from Italy, 63 Fed. Reg. 49,334 (Dep't Commerce Sept. 15, 1998) (countervailing duty order).

The Commission initiated sunset reviews of the antidumping and countervailing duty orders on August 1, 2003. Stainless Steel Wire Rod from Italy, Japan, Korea, Spain, Sweden, and Taiwan, 68 Fed. Reg. 45277 (ITC Aug. 1, 2003). The Commission decided to conduct full sunset reviews. Stainless Steel Wire Rod from Italy, Japan, Korea, Spain, Sweden, and Taiwan, 68 Fed. Reg. 65,085 (ITC Nov. 18, 2003).

During the pendency of the ITC's reviews, Commerce revoked the countervailing duty order on SSWR from Italy with respect to merchandise produced by Cogne. Notice of Implementation Under Section 129 of the Uruguay Round Agreements Act; Countervailing Measures Concerning Certain Steel Products From the European Communities, 68 Fed. Reg. 64,858 (Dep't Commerce Nov. 17, 2003). Commerce later issued a final negative determination in its sunset review of the countervailing duty order of SSWR from Italy and revoked that order, retroactive to September 15, 2003. Stainless Steel Wire Rod from Italy, 69 Fed. Reg. 40,354, 40,356 (Dep't Commerce July 2, 2004). Based on Commerce's actions, the ITC terminated its sunset review of the countervailing duty order. Stainless Steel Wire Rod from Italy, 69 Fed. Reg. 41,850 (ITC July 12, 2004). This removed Italian SSWR producer Valbruna from the ITC's sunset reviews completely, as Valbruna had been excluded from the antidumping duty order on SSWR from Italy. Consequently, the Commission did not cumulate data pertaining to Valbruna in its analysis of likely effects of revocation of the antidumping duty order on Italian SSWR. See Final Determ. (Pub.), at 9 n.37. Cogne remained as the only significant Italian producer of SSWR subject to the antidumping duty

order.

The ITC's sunset reviews culminated in the Final Determination, which concluded, by a four to two vote, that revocation of the antidumping duty orders on SSWR from Italy, Japan, Korea, Spain, Sweden, and Taiwan would likely lead to the continuation or recurrence of material injury within a reasonably foreseeable time. Final Determ. (Conf.) at 24. The ITC based its conclusion on a cumulative—rather than individual—assessment of imports from the six reviewed countries. The ITC's analysis drew in significant part on the report of its staff. See ITC Staff Confidential Report (June 10, 2004), INV-BB-074, List 2, C.R. Doc. 824 [hereinafter "Staff Report"], revised by (June 29, 2004), INV-BB-082, List 2, C.R. Doc. 847, and (July 7, 2004), INV-BB-089, List 2, C.R. Doc. 852. In reaching its decision to cumulate, the Commission adhered to a two-step approach: first determining that imports from each country were likely to have a discernible adverse impact, then determining that cumulation was appropriate. Final Determ. (Pub.) at 7–8.[3]

In the first step of its decision to cumulate Italian imports, the ITC determined that "we do not find that subject imports from Italy would likely have no discernible adverse impact on the domestic industry if the order were revoked." Final Determ. (Pub.) at 10. The ITC noted that SSWR imports from Italy during the initial period of investigation had been significant—although Cogne was not the only subject exporter during that period—and that after imposition of the antidumping

---

[3]

Commerce eventually affirmed the antidumping duty orders. Stainless Steel Wire Rod from Italy, 68 Fed. Reg. 68,862 (Dep't Commerce Dec. 10, 2003); Stainless Steel Wire Rod from Japan, 68 Fed. Reg. 68,864 (Dep't Commerce Dec. 10, 2003); Stainless Steel Wire Rod from South Korea, 68 Fed. Reg. 68,863 (Dep't Commerce Dec. 10, 2003); Stainless Steel Wire Rod from Spain, 68 Fed. Reg. 68,866 (Dep't Commerce Dec. 10, 2003); Stainless Steel Wire Rod from Sweden, 68 Fed. Reg. 68,860 (Dep't Commerce Dec. 10, 2003); Stainless Steel Wire Rod from Taiwan, 68 Fed. Reg. 68,865 (Dep't Commerce Dec. 10, 2003).

and countervailing duty orders, "Cogne's exports to the United States essentially stopped." Id. at 9.

With little recent pricing data to go on, the ITC's likely discernible adverse impact determination

was based on factors that, for ease of discussion, may be grouped as follows:

(a)     export orientation, including a demonstrated ability to shift volumes between export markets;
(b)     excess production capacity;
(c)     the attractiveness of the U.S. export market relative to Europe and Asia, based on production and price comparisons;
(d)     the continued presence of Cogne USA as a means of distribution into the U.S. market
(e)     Cogne's underselling in the U.S. market prior to the virtual cessation of exports

(f)     other factors, including the vulnerability of the U.S. domestic industry, the substitutability of SSWR from different sources, and the importance of price to purchasers.

Final Determ. (Conf.) at 8.

In the second step of the cumulation analysis, the ITC found cumulation of imports from all

six of the countries to be appropriate based on a determination that the countries' imports (1) would

be likely to compete with each other and with domestic like products in the U.S. market and (2) do

not differ significantly in the conditions of competition they face. Final Determ. (Conf.) at 6.[4]

Having decided to cumulate the subject imports from all countries, the Commission turned

---

[4]

The two dissenting Commissioners did not dispute the majority's conclusion as to the likely discernible adverse impact of Italian imports. Instead, they differed in the approach to cumulation. The dissenting Commissioners found that disparities in conditions of competition made it appropriate to cumulate subject imports in three groups: Italy and Korea; Japan and Taiwan; and Spain and Sweden. Final Determ. (Conf.) at 25 (V. Chairman Okun & Commissioner Pearson, dissenting). The dissent concluded that revocation of the antidumping orders on SSWR from Italy and Korea was not likely to lead to the continuation or recurrence of material injury within a reasonably foreseeable time. Id. at 46.

to the material injury analysis prescribed by 19 U.S.C. § 1675a(a) (2004). Based on a cumulative assessment of the likely volume, price effect, and impact on the domestic industry, the Commission determined that "revocation of the antidumping duty orders on SSWR would be likely to lead to a continuation or recurrence of material injury to the domestic industry within a reasonably foreseeable time." See Final Determ. (Pub.) at 19.

Cogne responded to the Final Determination by filing suit with this Court. In the instant motion for judgment on the agency record pursuant to USCIT R. 56.2, Cogne challenges the Commission's decision to cumulate subject imports from Italy with imports from other countries. Pls.' Op. Br. at 1–2. Cogne does not challenge the material injury determination on independent grounds. See id.

## STANDARD OF REVIEW

The court will reverse the ITC's determinations in a sunset review if they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); see also 19 U.S.C. § 1516a(a)(2)(B)(iii).

## DISCUSSION

In providing the ITC with qualified discretion to assess the likely volume and effects of subject imports on a cumulative basis, Congress intended to address the concern that a domestic industry could be injured by the "hammering effect" of unfairly traded imports from multiple countries, an effect that could be obscured if subject import levels were reviewed on a country-by-country basis. See H.R. Rep. No. 100-40, pt. 1, at 130 (1987), quoted in Nippon Steel Corp. v. United States, 29 CIT __, Slip Op. 05-72 (June 15, 2005), at 18 n.15, and Neenah Foundry Co. v.

United States, 25 CIT 702, 708, 155 F. Supp. 2d 766, 772 (2001).  Before cumulation may occur, however, the following conditions must be satisfied: (1) all reviews to be cumulated must be initiated on the same day; (2) the subject imports to be cumulated would be likely to compete with each other and with domestic like products in the United States market; and (3) the Commission has not determined that the subject imports to be cumulated "are likely to have no discernible adverse impact on the domestic industry."  See 19 U.S.C. § 1675a(a)(7).

Assuming the review initiation date element is satisfied, the ITC's decisions regarding whether to cumulate typically adhere to a two-step analysis.  First, the ITC determines whether the imports from each country to be cumulated would likely have a discernible adverse impact on the U.S. market.  See 19 U.S.C. § 1675a(a)(7).  If a discernible adverse impact is found, the second step requires that the ITC determine whether the imports it seeks to cumulate "would be likely to compete with each other and with domestic like products."  See 19 U.S.C. § 1675a(a)(7).  Cogne challenges both steps in the ITC's decision to include its production in the cumulated totals.  In reviewing these determinations, the court is mindful that the ITC has engaged in the inherently difficult task of predicting what is likely to happen in the future.

## I.    DISCERNIBLE ADVERSE IMPACT

Cogne's primary argument is that substantial evidence can only lead to the conclusion that imports from Italy are likely to have no discernible adverse impact on the domestic SSWR industry. Standards for evaluating the ITC's determination are scarce, however.  No statutory provision enumerates the factors to be considered by the ITC in making the discernible adverse impact determination.  Usinor Industeel, S.A. v. United States, 26 CIT 1402, 1408 (2002).  In the absence

of specific statutory guidance, the ITC "generally considers the likely volume of the subject imports and the likely impact of those imports on the domestic industry within a reasonably foreseeable time if the orders are revoked." Final Determ. (Conf.) at 5; accord Usinor Industeel, S.A. v. United States, 27 CIT __, Slip Op. 03-118 at 6 (Sept. 8, 2003).

In assessing likely volume for the purpose of the discernible adverse impact inquiry, even a modest likely volume may satisfy the statutory standard: "An adverse impact, or harm, can be discernible but not rise to a level sufficient to cause material injury." Usinor Industeel, 27 CIT __, Slip Op. 03-118 at 7. Indeed, the statute allows the ITC to cumulate "imports from various countries that each account individually for a very small percentage of total market penetration, but when combined may cause material injury." Neenah Foundry, 25 CIT at 708, 155 F. Supp. 2d at 771 (quoting H.R. Rep. No. 98-725, at 37 (1984)). Accordingly, the discernible impact standard is relatively easy for the ITC to satisfy. See id., 25 CIT at 711, 155 F. Supp. 2d at 774. Nevertheless, a reasonable finding of likely discernible adverse impact requires that the ITC establish that it is likely that Cogne could obtain a discernible amount of SSWR from somewhere—such as by exploiting excess capacity, by shifting from domestic and internal production, or by shifting from other export markets—and would have some incentive to sell a discernible amount into the U.S. market. For example, this Court recently affirmed the ITC's discernible adverse impact determination as to grain-oriented silicon electrical steel from Italy where, despite the Italian industry's high capacity utilization rate, a discernible amount of unused capacity remained that would likely be drawn to the U.S. by higher prices. Nippon Steel Corp., 29 CIT __, Slip Op. 05-72 at 22.

Cogne challenges the following factors cited by the ITC to supported its discernible adverse impact finding: (a) export orientation, including a demonstrated ability to shift volumes between export markets; (b) excess production capacity; (c) the attractiveness of the U.S. export market relative to Europe and Asia; (d) Cogne USA's continued presence as a means of distribution into the U.S. market; and (e) Cogne's underselling in the U.S. market. Cogne challenges the remaining factors only indirectly, arguing that they are unable to compensate for the shortcomings of the above findings.

### A.    Export Orientation

Cogne challenges the Commission's finding that Cogne was increasingly export-oriented. The ITC found Cogne to be "increasingly export-oriented" based on the fact that, from 1998 to 2003, the company increased its exports to markets other than the United States.[5] As shown on a table in the ITC's staff report showing exports for the "European Union," "Asia," and "all other markets," the absolute volume of Cogne's non-U.S. exports increased year-over-year during the period of review, except between 2000 and 2001. See Staff Report at IV-13, Table IV-5.[6]

As the ITC recognized, however, its description of Cogne as "increasingly export-oriented"

_____

[5]

 While Cogne has exported only small volumes to the United States since the order has been in place it [          ] increased its exports to other markets from 1998 to 2003. In 2003, only [          ] of Cogne's shipments served Italy, either through commercial sales or through internal consumption. While the great majority of its shipments are to Europe and these shipments have increased over the period, the fact remains that Cogne is increasingly export-oriented.

Final Determ.(Conf.) at 7 (citing Staff Report at IV-13, Table IV-5).

[6] In contrast, exports to the United States virtually ceased. Staff Report at IV-13, Table IV-5.

references not merely absolute increases in exports, but the relationship between exports and domestic shipments in Italy. In 2003, less than half of Cogne's shipments served Italy, either through commercial sales or through internal consumption, and exports as a share of total shipments were greater than in the prior year.[7] Although year-after-year increases in exports relative to shipments within Italy do not obtain for the entire period of review, the absolute and relative increases in exports nevertheless constitute substantial evidence for the Commission's finding.[8]

Cogne challenges the export orientation finding by analyzing the "all other markets" category listed on Table IV-5 of the Staff Report, emphasizing that a very high percentage of those exports were to Country X, which is very close to Cogne's Italian production facilities.[9] According to Cogne, shipments to a location so geographically close to its production facility cannot reasonably be interpreted as indicators of an increased orientation in favor of exporting. Pls.' Op. Br. at 12.

Apparently, Cogne misunderstood the Commission's reference to an increase in "exports to other markets," thinking it pertained only to the "all other markets" subset of non-U.S. imports, which excludes the European Union and Asia. First, no such reading of the Final Determination or the table in the Staff Report is warranted: the Commission's explanation is most reasonably

---

[7] "In 2003, only [          ] of Cogne's shipments served Italy, either through commercial sales or internal consumption." Final Determ. (Conf.) at 7.

[8]

[

].

[9]

[

]

understood as pertaining to all export markets other than the United States.  See Final Determ.(Pub.) at 9.  Considering all non-U.S. export markets, Cogne's exports did indeed increase from 1998 to 2003, albeit not consistently from year to year.  Second, if one simply looks at all non-U.S., non-Country X exports, exports increased beyond a negligible amount, including exports to markets thousands of miles away.  Exports to Country X, then, are not the sole indicator of export orientation; the ITC may find increasing export orientation on the basis of exports to other countries.  Third, the court is unpersuaded by Cogne's claim that it is "patently absurd" for the ITC to include exports to a nearby market along with all other exports.  See Pls.' Op. Br. at 12.  Although exports to a nearby country are less probative of a likelihood to export to the United States than exports to the Americas or Asia, it was nevertheless reasonable for the ITC to assess export-orientation relative to domestic shipments on the basis of all exports rather than distinguishing among exports on the basis of some unspecified measure of distance from Cogne's Italian facilities.

Cogne also repeats its erroneous reading of the export-orientation portion of the Final Determination in challenging the ITC's finding that Cogne has an "ability and practice of shifting between export markets."  Final Determ. (Conf.) at 7 n.45.  This finding was based on observed fluctuations in the company's shipments to its "larger markets."  Final Determ. (Conf.) at 7 n.45.[10]
 Cogne asserts that a high proportion of the "increase consists of increased shipments to [Country X]."  Pls.' Conf. Op. Br. at 13.  Cogne neglects to mention that the EU and Asia may also be considered as among Cogne's larger markets, and exports to these markets did indeed fluctuate by

---

[10] [

                                                                                                      ]

significant amounts.[11]

### B.    Capacity

Next, Cogne challenges the ITC's finding that it possesses excess capacity to produce SSWR, asserting that, because of the limitations of its heat treatment plant, its "excess capacity is zero . . . Uncontradicted record evidence demonstrates that Cogne has <u>no</u> ability to increase production with existing equipment." Pls.'' Op. Br. at 17.  In the <u>Final Determination</u>, the ITC observed that, based on data provided by Cogne and included in the <u>Staff Report</u>, Cogne had increased its total capacity by a non-negligible amount since 1998, and had non-negligible excess capacity in 2003, which was equivalent to a non-negligible percentage of apparent U.S. consumption.  <u>Final Determ. (Conf.)</u> at 8.[12]

Despite submitting numerical data showing a non-negligible amount of excess capacity, Cogne, at certain points during the review, submitted descriptions of its excess capacity describing it as minimal because of capacity limitations in its heat-treatment mill, which treats unfinished SSWR after it exits the hot-rolling mill.  These descriptions, however, admit at least <u>some</u> excess capacity.  A Cogne officer gave the following hearing testimony:

_____

[11] [

]

[12] [

]  <u>Final Determ. (Conf.)</u> at 8.  [

] The dissenting Commissioners found that producers in Italy "have some available unused capacity or some inventories on hand which could be diverted to the U.S. market in the event of revocation, although...those available resources are modest." <u>Dissent to Final Determ. (Conf.)</u> at 27.

> Cogne has <u>almost</u> no excess capacity left that could be utilized to direct additional exports of stainless steel wire rod to the U.S. market, because there is no heat treatment capacity available for increasing stainless steel rod production, even though there is a small amount of capacity in the hot mill.

Test. of Ms. Pirovano, Tr. at 187 (emphasis added). This testimony is seemingly contradictory, admitting some excess capacity yet claiming no available heat treatment capacity. The testimony also conflicts with Cogne's description of its capacity in its questionnaire response, which listed total production capacity of its rolling mill—not the heating mill—as the "main constraint" on production capacity. <u>Cogne Quest. Response</u> (Mar. 30, 2004), at 6, List 2, C.R. Doc. 729, Def.'s App., List 2, Doc. 729.[13] The questionnaire response also admitted some excess capacity when it described utilization of both its hot rolling mil and heat treatment furnace as "<u>almost</u> fully saturated." <u>Id.</u> at 6, 12, Def.'s App., List 2, Doc. 729 (emphasis added).

Cogne admitted the same in its <u>Final Comments</u> when it elaborated on its numerical data, leaving open the possibility that non-negligible amounts of excess capacity remained available. Cogne stated that, despite very high[14] capacity utilization its hot-rolling mill, Cogne "could not operate at 100 percent of its rolling mill capacity even if it wanted to do so because [Cogne's] heat treatment capacity is <u>almost</u> fully saturated with present level of wire rod production." <u>Cogne Final Comments</u> (July 1, 2004), at 10, List 2, C.R. Doc. 850, Def.'s App., List 2, Doc. 850 (emphasis

---

13

When asked to "describe the constraint(s) that set the limit(s) on your production capacity," Cogne's questionnaire response reads in full as follows: "The main constraint is the total production capacity of [        ] rolling mill [                        ]. Please also note the limitations on [              ] heat treatment capacity discussed in response to question II-10, which limits the amount of SSWR that [        ] can produce." <u>Cogne Quest. Response</u> at 6, Def.'s App., List 2, Doc. 729.

[14] The hot-rolling mill's capacity utilization was [                    ]. This is indeed a very high capacity, but it must be viewed in terms of the discernible impact standard, and it is only one of several factors.

added).

Considering the inconsistencies and ambiguities of Cogne's verbal descriptions of its capacity utilization, the court finds that the ITC properly relied on the numerical capacity data Cogne provided. Cogne's excess capacity may seem modest when considered on its own, but when the scale of Cogne's production is related to that of the entire U.S. industry,[15] Cogne's excess capacity appears readily capable of having a discernible impact on the U.S. market.

### C.      Relative Attractiveness of Export Markets

Having determined on the basis of substantial evidence that Cogne is (a) increasingly export-oriented and capable of shifting export volumes among markets, and (b) capable of using excess capacity to produce a discernible amount of SSWR, the Commission must also establish that Cogne would likely have an incentive to export to the U.S. market. In this regard, the ITC found the following: (1) overcapacity in Europe, and (2) generally lower prices in Europe and consistently lower prices in Asia, as well as a production increase in China, which outweigh Cogne's stated commitment to the Asian market.

### 1.      Overcapacity in Europe

The ITC observed that "[r]eported overcapacity in the integrated European market suggests that this market will be less attractive in the foreseeable future." Final Determ. (Conf.) at 7. The ITC supported this observation by citing tables attached to the Domestic Industry's Posthearing Brief as Exhibit 2. See Final Determ. (Conf.) at 7 n.46. This exhibit provides several tables, two of which

---

[15] As the ITC observes in its brief to the court, "Cogne's production of SSWR in 2003 [                    ]." Def. Br. at 15 (comparing Staff Report Table III-1 with Table IV-5).

are sourced from the Iron and Steel Statistics Bureau and provide production, export, import, and consumption data for a number of SSWR producers throughout the world, including 13 European producers. The only capacity data, however, derives from a different source, Iron and Steel Database, and provides capacity data for only Cogne, a Spanish firm, and a Swedish firm;[16] capacity data for the rest of Europe is included in subtotal line items. Cogne challenges the reliability of this data. As indicated by Cogne, the total capacity for Europe does indeed seem to double-count, adding the subtotal line items to the individual line items. The table also gives values for metric tons only in double and triple digits, indicating that the table failed to state that the values were for thousands of metric tons.

After correction for double-counting and listing in thousands of metric tons, the Iron and Steel Database data is largely consistent with the alternatively-sourced data in the Staff Report in terms of production data for Spain and all of Europe, as well as capacity data for Sweden. The discrepancies lie with the table's capacity values for Cogne, which are somewhat lower[17] than the Staff Report values for the years 2000 through 2002 and somewhat higher[18] than the Staff Report value for 2003. When the Iron and Steel Database capacity data is compared to the Iron and Steel Statistics Bureau apparent consumption data, the comparison still shows over-capacity in Europe. Cogne does not cite any record evidence refuting such over-capacity; the company only attempts to undermine the reliability of the Iron and Steel Database capacity data. Although this data is not

_____

[16] [                                                                    ]

[17] [               ]

[18] [               ]

wholly consistent with the capacity data Cogne provided in its questionnaire responses, it is consistent with data pertaining to other producers, derived from different industry sources.

Cogne does not assert an absence of over-capacity in Europe, but instead argues that the ITC ignored data showing increases in European consumption over the last three years of the period of review. This point fails to undermine the ITC's finding; even if Europe's consumption of SSWR grows, overcapacity in Europe may still inhibit price increases.

Cogne also faults the ITC for failing to explain why the European market, in which ITC finds overcapacity, would be less attractive than the U.S. market, in which the ITC also finds over-capacity. See Pls.' Op. Br. at 14–15 (citing Final Determ. (Pub.) at 40, for the ITC's finding that "[b]y 2003 . . . domestic production capacity exceeded apparent U.S. consumption by a substantial margin"). This would indeed be a weakness of the ITC's finding if it were based on nothing more than the mere fact of overcapacity. After all, overcapacity in one market may not make it less attractive to an exporter if overcapacities are greater in alternative markets. There is more to the ITC's finding, however. The ITC supported its finding by citing the Petitioner's Posthearing Brief, which discusses not merely significant overcapacity among major European Union producers but also significant declines in exports to the EU during the period of review on the part of Cogne, another European producer, and two Asian producers. See Pet'rs Posthearing Br. at 13–14, Ex. 2. During the same period, Cogne's exports to Country X and Asia increased significantly, as did its total production. Accordingly, substantial evidence supports the ITC's finding that European over-capacity suggests that this market will be less attractive in the foreseeable future.

> **2.      Price and Production Factors Outweigh Cogne's stated commitment to China**

In the course of the review, Cogne claimed its recent and likely future export behavior indicate an increasing commitment to the Asian market, a commitment from which Cogne would not deviate even if the U.S. antidumping duty order was revoked. To support its claim, Cogne cited its new coat finishing facility in China, which produces downstream products from its SSWR. See Tr. at 186–87. The ITC found Cogne's claim to be outweighed by the high prices of SSWR in the U.S. market relative to Europe and Asia as well as significant production increases in China. See Final Determ. (Conf.) at 7–8.[19]

> **a.      Relative Prices in the U.S., Europe, and Asia**

In a footnote to its statement regarding relative prices, the ITC noted that "the record evidence is mixed with respect to whether prices in the United States are higher or lower than prices in other markets." See id. at 7 n.49. Despite the mixed evidence, the ITC relied "mainly on data from the Iron and Steel Statistics Bureau, an independent source of steel industry data, showing that, from January 2000 through April 2004, U.S. prices for SSWR have been consistently higher than

---

[19]

    The ITC provided the following explanation:

    Furthermore, Cogne's shipments to another non-European market, the Asian market, increased [          ] from 2001 to 2003. Cogne argues that it is committed to serving the Asian market, particularly China, and has invested in a new facility in China for production of downstream products from SSWR. However, some sources suggest that prices for SSWR have been generally lower in Asia and Europe than the United States during the majority of the review period, although the relationship between U.S. and European prices has fluctuated in 2003 and 2004. Production of SSWR in China is expected to increase significantly.

Final Determ. (Conf.) at 7–8.

prices in Asia, and higher than prices in Europe for all but nine months in 2003 and 2004." Final Determ. (Pub.) at 10 n.49 (citing Pet'rs Posthearing Br. at Ex. 6).

Cogne observes that the Iron and Steel Statistics Bureau data show European prices to be higher than U.S. prices during nine of the 16 most recent months, but this does not deprive the ITC of a substantial evidence for its finding as to European prices. As the ITC points out in its brief to the court, U.S. prices were higher than European prices during 43 of the 52 months in the data set, and it is for the ITC to determine the weight accorded different time periods. See Def's Br. at 21 n.6 (citing Usinor Beautor v. United States, 342 F. Supp. 2d 1267, 1283 (CIT 2004), for the ITC's authority to weight time periods).

Cogne provides a more compelling argument with regard to comparisons between U.S. and Asian prices. Without disputing the data that show Asian prices to be consistently lower than U.S. prices, Cogne argues that the ITC improperly discounted the fact that the higher U.S. prices are overcome by significantly higher transportation costs relative to Asia, costs not reflected in the Iron and Steel Statistics Bureau data. See Pls.' Op. Br. at 16. In addressing transportation costs in the course of its cumulative analysis of likely import volume, the ITC found that "transportation costs do not appear to provide much disincentive to shipping SSWR to the United States from Asia and Europe." Final Determ. (Conf.) at 19. To support this finding, the ITC cited information in the Staff Report showing that "transportation costs [for SSWR from subject countries to the United States] were greatest for SSWR from Italy at 9.0 percent of total costs, yet at least one Italian producer, Valbruna, continued to export to the U.S. market." Id. at n.160. Although Valbruna's persistent exports show that transportation costs are not so high as to preclude every Italian SSWR producer from shipping to the United States, this information has modest probative value in establishing that

Cogne, the lone Italian respondent in this review, will not be attracted to non-U.S. export markets by lower transportation costs.[20]

In support of Cogne's position that transportation costs outweigh the relatively higher prices in the U.S. market compared to Asia, Cogne's chief executive officer testified to the effect that transportation costs from Italy to Asia were lower than those from Italy to the United States. See Tr. at 186, List 1, P.R. Doc. 636. Cogne also submitted record evidence showing that, for some shipments from its Italian production facility in 2004, transportation costs were significantly greater for shipments to the United States than for shipments to South Korea. See Cogne Posthearing Br. at Ex. 5.[21] The ITC responds in its brief to the court that Cogne "never presented any quantitative analysis of relative transportation costs and price differentials to demonstrate that relatively higher prices in the United States are completely offset by higher transportation costs." Def.'s Br. at 23. One wonders, however, what else Cogne could have done to provide the ITC with information supporting its argument. The ITC did not address Cogne's argument in the Final Determination, relying instead on the mere fact that a different Italian producer continued to export to the U.S. market to show that Cogne would not be likely to encounter prohibitive transportation costs.

Considering the evidence submitted by Cogne, the ITC should have addressed transportation

---

[20] Cogne also argues that Valbruna's continued exports do not support the ITC's position, as other factors, such as Valbruna's extensive U.S. distribution network, may attract exports. Pls.' Reply Br. at 9 (citing Cogne Posthearing Br. at 13).

[21] Cogne submitted several invoices showing transportation costs along with a page summarizing the information contained on the invoices. A comparison of the transportation costs on the summary page shows Cogne's cost of shipping SSWR from Italy to the United States to be between [   ] and [   ] percent more expensive than shipping from Italy to South Korea. See Cogne Posthearing Br. at Ex. 5.

costs more thoroughly in the Final Determination. If relative transportation costs were central to the ITC's reasoning, it would be necessary to remand so that the ITC could re-weigh the evidence. This is not the case, however. As the record stands, it remains unclear whether Cogne's transportation costs outweigh the data showing prices to be consistently higher in the United States than Asia. Apart from this inconclusive issue, the ITC relied on substantial evidence showing that Cogne was increasingly export-oriented, could produce discernible quantities of SSWR for export to the U.S. market, and was likely to find the U.S. market more attractive than the EU market in the foreseeable future. Additional supporting evidence is discussed below. This other evidence, taken as a whole and considered in light of the relatively low standard at issue, was sufficient to support the Commission's ultimate conclusion. Cf. United States Steel Group v. United States, 96 F.3d 1352, 1364–65 (Fed. Cir. 1996) ("Even if the Commissioners' subsidiary price-suppression finding was not supported by substantial evidence . . . we find that the other evidence relied on by Commissioners Watson and Rohr, taken as a whole, was sufficient to support their ultimate conclusion."). The court does not believe that, on remand, further analysis of the ambiguities surrounding this narrow issue would alter the Commission's view of the whole record or its ultimate conclusion. Accordingly, remand of this issue is unnecessary.

### b.      Increased Production in China

Cogne does not challenge directly the ITC's finding that China is adding significant production capacity. The ITC cited a March 2002 news report stating that a Chinese SSWR producer was scheduled to begin to use new equipment in 2004 to increase production significantly by 2005.

See Final Determ. (Conf.) at 8 n. 51.[22]  Considering that increased production in this article is significantly greater than the amount of China's 2003 imports,[23] the ITC reasonably relied on an expected increase in Chinese production.

### c.      Cogne's Stated Commitment to Asia

In relying on the above findings, Cogne contends that the ITC improperly discounted the company's increasing commitment to Asia, as reflected in its investment in a downstream production facility in China.  See Pls.' Op. Br. at 15.  The ITC noted that "Cogne did not provide specific data reflecting the volume of SSWR to be shipped" to its facility in China.  Final Determ. (Pub.) at 9 n.48.  Cogne argues that, in doing so, the ITC effectively is applying adverse facts available.  Not so; if Cogne wanted the ITC to interpret the existence of the Chinese facility as demonstrating Cogne's ironclad commitment to direct any excess production to the Asian market, Cogne bore the burden of providing enough information, including that under its sole control, to allow a reasonable factfinder to reach that conclusion.  It did not do so.  The ITC reasonably concluded that the record did not show that the existence of Cogne's Chinese facility foreclosed the likelihood that Cogne would have an incentive to direct some discernible amount of SSWR into the U.S. market.

---

[22]   The Final Determination cites the Staff Report at IV-34–IV-35, which in turn cites the news article.  See [          ] mill orders rod outlet from [      ], AMM.com - Steel News (March 19, 2002) (reporting that Chinese capacity will increase by at least [      ] metric tons).

[23]   The [      ] metric ton figure cited in the news article exceeds Chinese imports for 2003, as calculated by [                                    ] by about [             ].  See Staff Report at Table IV-20.

### D.    Cogne USA's Role as a U.S. Distribution Network

Cogne also challenges the ITC's conclusion that Cogne's U.S. affiliate, Cogne USA, "provides a ready outlet and distribution network for Cogne's exports to the United States." Final Determ. (Conf.) at 8. The ITC did not cite any record evidence for its finding. Cogne contends that the record shows only that Cogne USA has at least one employee, see Cogne USA Importer Quest. Response (Mar. 25, 2004), at 4, C.R. Doc. 741, Def.'s App., List 2, Doc. 741, and that it imported SSWR in the past but has not imported any SSWR since 2000. See id. at 6; see also Pls.' Reply Br. at 10 ("The mere presence of a company on paper with one employee does not provide substantial evidence that Cogne is likely to sell more than negligible amounts of SSWR in the reasonably foreseeable future."). In its brief to the court, the ITC argues that there is sufficient record evidence to show that Cogne USA continues to be affiliated with Cogne, is an importer, and could act as a distributor for Cogne" and that it remains Cogne's exclusive distributor in the United States.[24]

Cogne's characterization of its U.S. affiliate as little more than a corporate name and an employee is contradicted by Cogne USA's questionnaire response stating that, essentially, it was in a position to operate as it had done in 1998, prior to imposition of the antidumping duty order.[25] See Cogne USA Importer Quest. at 4, Def.'s App., List 2, Doc. 741. In 1998, Cogne exported a non-

---

[24]  The ITC notes that Cogne USA reported that [
                                    ] and may "[                                                        ]." Cogne USA Importer Quest. Response at 8, Def.'s Ap., List 2, Doc. 741.

[25]
Cogne USA stated that there were [
                                    ]. See Cogne USA Importer Quest. at 4, Def.'s App., List 2, Doc. 741.

negligible amount of SSWR to the United States,[26] which can reasonably be inferred to have been imported by Cogne USA, and no record evidence exists to suggest that Cogne USA would be incapable of importing similar non-negligible quantities of SSWR in the future. Cogne states that Cogne USA imported only a small amount[27]—after imposition of the antidumping duty order—but this does not refute the proposition that Cogne USA remains in a position to import non-negligible quantities of SSWR. Accordingly, the ITC reasonably found that Cogne USA could distribute significant quantities of SSWR in the event of revocation.

**E.      Pattern of Underselling**

With regard to Cogne's pricing patterns in the U.S. market, the ITC identified a "pattern of underselling during the original investigations, as well as in 1998 and 1999," indicating "that subject imports would likely be sold a prices likely to depress domestic prices if the order were revoked." Final Determ. (Conf.) at 8. The Staff Report reported that Cogne undersold in 10 of 11 circumstances in 1998 and 1999, although most instances (or all but 1) occurred prior to imposition of the order. Cogne argues that, for the ITC's reference to underselling in 10 of 11 sales in 1998 and 1999, only a small portion of the 10 instances occurred after entry of the antidumping duty order in September 1998.[28] See Pls.' Op. Br. at 18 (citing Cogne USA Importer Quest. Resp. at 11; and Staff Report at Tables V-1 through V-6).

---

[26] [                                                                               ]

[27] [                                                        ]

[28] Cogne states in its brief that Cogne USA reported only [                    ] after the third quarter of 1998, in the amount of [    ] tons in [                        ]. See Pls.' Op. Br. at 18 (citing Cogne USA Quest. Resp. at 11; and Staff Report at Tables V-1 through V-6, with the [

]).

Cogne's argument fails. The ITC is required to examine pricing for the period covered by the initial investigation, see 19 U.S.C. § 1675a(a)(1)(A), as that period "is the most recent time during which imports of the subject merchandise competed in the U.S. market free of the discipline of an order." Uruguay Round Agreements Act Stmt. of Admin. Action, H.R. Rep. No. 103-316, at 884 (1994). The record presents three sets of pricing data for Italian SSWR producers. The first pertains to the original 1997-98 investigation and shows that Italian producers undersold domestic SSWR in 37 of 44 comparisons. Although Cogne accounted for the majority of exports to the United States during that period,[29] no evidence exists to show conclusively that Cogne was responsible for the 37 instances of underselling. See Def.'s Br. at 30. The ITC recognized this when it stated that shipments from an exempt Italian producer, Valbruna, probably accounted for some of the underselling. Final Determ. (Conf.) at 8. Considering the amount of Cogne's exports during the initial investigation period and the high incidence of underselling, it is reasonable for the ITC to infer that some underpricing was attributable to Cogne.

More persuasive is the second data set, which shows Cogne's sales during 1998 and 1999. As indicated, these data show underselling in 10 of 11 comparisons. Cogne responds that this second data set cannot support a finding of adverse effect because even lower-priced sales could have been made by an exempt Italian producer, which did not submit pricing data for this period. See Pls.' Reply Br. at 12. The court disagrees with Cogne. The ITC's finding of a pattern of underselling, while supported by a vague but reasonable inference for the original investigation period, is confirmed by the data from 1998 and 1999.

---

[29] [                                                                                                    ]

**F.     Other Factors**

To provide further support for its discernible adverse impact finding, Cogne cited other factors such as the vulnerability of the domestic industry, the substitutability of SSWR from different sources, and the importance of price to purchasers. Cogne does not challenge these factors directly, arguing only that, taken together, they are insufficient to support the ITC's finding if one discounts the factors discussed in the previous sections. As the factors cited above do indeed support the ITC's determination, this argument fails.

**II.     THE ITC'S EXERCISE OF DISCRETION TO CUMULATE WAS BASED ON SUBSTANTIAL EVIDENCE**

Cogne argues in the alternative that, even if cumulation were permissible under the discernible adverse impact standard, the ITC's decision to cumulate would still be unsupported by substantial evidence. See Pls.' Op. Br. at 21–25. Cogne's first point repeats arguments from the prior discussion, whereby Cogne claims to be subject to different conditions of competition than other cumulated producers on the basis of its "extremely high" capacity utilization and the virtual absence of exports to the United States during the period of review. As discussed above, these considerations do not preclude the likelihood that Cogne will export more than negligible amounts of SSWR in the event of revocation. Accordingly, this argument is insufficient to render unreasonable the ITC's concern that even modest imports from Italy will contribute to the "hammering effect" that cumulation is designed to address.

Cogne's second argument is that the ITC's exercise of its discretion to include Italian imports in its cumulation analysis is inconsistent with past practice. See Pls.' Op. Br. at 22. Cogne attempts to support this argument by discussing purported similarities between its situation and that of the

Canadian imports excluded from cumulation in <u>Certain Carbon Steel Products from Australia, Belgium, Brazil, Canada, Finland, France, Germany, Japan, Korea, Mexico, the Netherlands, Poland, Romania, Spain, Sweden, Taiwan, and the United Kingdom</u>, Inv. Nos. AA-1921-197 (review), 701-TA-231, 319–320, 322, 325–328, 340, 342, and 349–350 (review), and 731-TA-573–576, 578, 582–587, 604, 607–608, 612, and 614–618 (review), USITC Pub. 3364 (Nov. 2000) [hereinafter <u>Carbon Steel Products</u>], at 22–23.  Leaving aside whether the ITC's treatment of Canadian imports in that review constitutes a past practice, <u>Carbon Steel Products</u> differs significantly from the instant case.  In <u>Carbon Steel Products</u>, the lone Canadian producer was not export-oriented—nearly all of its shipments remained in its home market or were internally consumed—and was reasonably expected to remain focused on its home market because of a number of antidumping duty orders imposed by the Canadian government.  The ITC described these differences in the <u>Final Determination</u>.  <u>Final Determ. (Pub.)</u> at 16–17 n.115.  Accordingly, Cogne fails to show that the ITC unreasonably exercised its discretion to cumulate Italian imports.

**CONCLUSION**

Charged with the difficult task of predicting what would be likely to happen in the event of revocation of the antidumping duty orders on SSWR, the ITC performed an adequate review with regard to SSWR imports from Italy.  The ITC should have at least acknowledged the weakness in its analysis of transportation costs, but this shortcoming was not so central to the Final Determination's ultimate conclusion that the ITC is required to re-weigh the evidence. Substantial record evidence, taken as a whole, supports the ITC's determination that Italian SSWR imports would likely have a discernible adverse impact.  Substantial evidence also supports the ITC's decision to cumulate Italian imports together with imports of all other subject countries. Accordingly, Plaintiffs' motion for judgment on the agency record is denied, and judgment will enter for Defendant pursuant to USCIT R. 52.2(b).


                                                          /s/ Jane A. Restani
                                                         Jane A. Restani
                                                         Chief Judge


Dated:  This 12th day of September, 2005.
          New York, New York

**ERRATUM**

Please make the following changes to <u>Cogne Acciai Speciali S.P.A. v. United States</u>, No. 04-00411, Judgment to Slip. Op. 05-122 (CIT September 12, 2005):

- Page 28, line 11: Replace "USCIT R. 52.2(b)" with "USCIT R. 56.2(b)"

February 7, 2005