**Slip Op. 08 – 82**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| UNITED STATES STEEL CORPORATION, | |
| Plaintiffs, | Before: Richard W. Goldberg, Senior Judge |
| MAVERICK TUBE CORP., | |
| Plaintiff-Intervenor, | |
| v. | Court No. 07-00271 |
| UNITED STATES, | |
| Defendant, | **PUBLIC VERSION** |
| and | |
| DALMINE, S.P.A., SIDERICA, S.A.I.C., JFE STEEL CORPORATION, NIPPON STEEL CORPORATION, SUMITOMO METAL INDUSTRIES LTD., HUSTEEL CO., LTD., SeAH STEEL CORP., SHELL EXPLORATION & PRODUCTION, CO. | |
| Defendant-Intervenors. | |

**OPINION**

[The ITC's second five-year review is sustained.]

Date: August 5, 2008

Skadden Arps Slate Meagher & Flom, LLP (James C. Hecht, John J. Mangan, Robert E. Lighthizer, Stephen P. Vaughn) for Plaintiff United States Steel Corporation.

Williams, Mullen, Clark & Dobbins (James R. Cannon, Jr., Dean A. Barclay, Francisco J. Orellana) for Plaintiff-Intervenor Maverick Tube Corp.

James M. Lyons, General Counsel; Neal J. Reynolds, Assistant
General Counsel, Office of the General Counsel, United States
International Trade Commission (Marc A. Bernstein) for Defendant
United States.

White & Case, LLP (Gregory J. Spak, Kristina Zissis) for
Defendant-Intervenors Dalmine S.p.A., and Siderca S.A.I.C.

Robert C. Cassidy PLLC (Robert C. Cassidy, Jr.) and Wilmer,
Cutler, Pickering, Hale & Dorr, LLP (John D. Greenwald) for
Defendant-Intervenors JFE Steel Corporation, Nippon Steel
Corporation, and Sumitomo Metal Industries, Ltd.

Troutman Sanders LLP (Donald B. Cameron, Brady W. Mills, Jeffrey
S. Grimson, Julie C. Mendoza, Rudi W. Planert) for Defendant-
Intervenors Husteel Co., Ltd., and SeAH Steel Corp.

Jones, Walker, Waechter, Poitevent, Carrere & Denegre (Marc C.
Hebert) for Defendant-Intervenor Shell Exploration and
Production Co.

**GOLDBERG, Senior Judge**:  This case is before the Court on

Plaintiff's motion for judgment on the agency record.  Plaintiff

United States Steel Corporation ("**U.S. Steel**") seeks judicial

review of the U.S. International Trade Commission's ("**ITC**")

second five-year review of the orders against Oil Country

Tubular Goods ("**OCTG**") from Argentina, Italy, Japan, Korea, and

Mexico.  See Oil Country Tubular Goods from Argentina, Italy,

Japan, Korea, and Mexico, 72 Fed. Reg. 34480 (ITC, June 22,

2007) ("**Five Year Review**").  For the reasons that follow, the

Court sustains the results of the ITC's second five-year review.

## I.    BACKGROUND

In 1995, the ITC determined that OCTG imports from

Argentina, Italy, Japan, Korea, and Mexico were causing material

injury to U.S. producers.  Subsequently, the U.S. Department of Commerce published antidumping and countervailing duty orders on these imports.[1]

In 2001, the ITC completed its first five-year review of these orders.  See Oil Country Tubular Goods from Argentina, Italy, Japan, Korea, and Mexico, Inv. Nos. 701-TA-364, 731-TA-711, 713-716 (first review), USITC Pub. 3434 (June 2001).  In this review, the ITC cumulatively assessed the impact of revoking the collected orders and determined that revocation would likely cause material injury to U.S. industry. Accordingly, the orders were left in place.

In 2006, the ITC conducted its second five-year review of the orders.  During this investigation, the ITC decided not to cumulate the impact of revoking all orders because it found that the subject imports would compete differently upon revocation. The ITC did, however, cumulate the Argentina, Italy, and Mexico OCTG orders.  After its investigation, the ITC found that revoking the orders would not lead to the continuation or reoccurrence of material injury to the domestic industry.  U.S. Steel challenges this determination arguing that:  (1) the ITC abused its discretion in failing to cumulate the impact of

---

[1] After the initial investigation, antidumping duties were imposed on OCTG imports from Argentina, Italy, Japan, Korea, and Mexico.  Additional countervailing duties were imposed on Italian imports.

revoking all orders; (2) the ITC's material injury determinations lack substantial evidence; and (3) the ITC failed to provide a fair and impartial hearing.[2]

## II.  JURISDICTION & STANDARD OF REVIEW

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) (2000).  The Court "shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i) (2000).  Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 619-20 (1966)).  Moreover, the Court cannot substitute its judgment for that of the ITC "nor must the court 'displace the [agency's] choice between two fairly conflicting views, even though the court would have justifiably made a different choice had the matter been before it de novo.'"  Allegheny Ludlum Corp. v. United States, 30 CIT __, __, 475 F. Supp. 2d 1370, 1374 (2006) (citations omitted)).

---

[2] U.S. Steel does not challenge the ITC's findings regarding the Mexico OCTG order.

## III. DISCUSSION

A. **Cumulation**

Under 19 U.S.C. § 1675(c) (2000), the ITC reviews, every five years, whether revoking an order would be "likely to lead to the continuance or reoccurrence of dumping. . . ."[3] For this review, the ITC may cumulate the impact of revoking multiple orders if the statutory prerequisites are met. See 19 U.S.C. § 1675a(a)(7) (2000). No guidance, however, is given as to what factors the ITC should consider in making its cumulation determination. See Freeport Minerals Co. v. United States, 776 F.2d 1029, 1032 (Fed. Cir. 1985). The ITC's discretion is not completely unfettered as its determination "[must] be predicated upon a judgment anchored in the language and spirit of the relevant statutes and regulations." See id. at 1032.

Here, the ITC based its cumulation decisions on the differences in the post-revocation competitive conditions the subject imports would likely face.[4] Based on this factor, the

---

[3] 19 U.S.C. § 1675(c)(1) provides that:

> 5 years after the date of publication of . . . a
> countervailing duty order . . . [or] an antidumping
> duty order . . . the Commission shall conduct a review
> to determine, in accordance with section 1675a of this
> title, whether revocation of the countervailing or
> antidumping duty order would be likely to lead to the
> continuation or reoccurrence of dumping or a
> countervailable subsidy . . . and of material injury.

[4] U.S. Steel also objects to the separate methodology utilized by

(footnote continued)

ITC cumulated the impact of revoking the Argentina, Italy, and Mexico OCTG orders, but declined to cumulate these orders with the Japan and Korea OCTG orders, or to separately cumulate the Japan and Korea OCTG orders.  U.S. Steel challenges these determinations claiming that the ITC abused its discretion in failing to address what it alleges is the essential purpose of cumulation: preventing the hammering effect caused by simultaneously revoking multiple orders.

i.   **The ITC Did Not Abuse Its Discretion in Not Cumulating the Argentina and Italy Orders with the Japan and Korea Orders.**

The ITC determined that OCTG from Argentina, Italy, and Mexico would compete differently than OCTG from Japan and Korea upon revocation.  The ITC based this decision primarily on the fact that Tenaris, a global manufacturer controlling all OCTG production in Argentina, Italy, and Mexico, had recently purchased Maverick Tube Corporation ("**Maverick**"), a large U.S. producer.  According to U.S. Steel, this factor does not relate to the language and spirit of the relevant statutes.  U.S. Steel's position, however, artificially limits the ITC's

---

Commissioners Pearson and Okun.  These Commissioners first evaluated the likely conditions of competition the imports would face.  As they found the subject imports were not likely to compete under similar conditions, they did not continue and evaluate whether the statutory cumulation requirements were met. This analysis is accordance with law.  Nothing in the cumulation provision requires the ITC to consider any factors, but only prohibits cumulation if these threshold requirements are not met.  See § 1675a(a)(7).

statutory discretion.  The Court has repeatedly allowed the ITC to consider many factors related to differences in the likely post-revocation conditions of competition.  See Allegheny Ludlum, 30 CIT at __, 475 F. Supp. 2d at 1377-78; Neenah Foundry Co. v. United States, 25 CIT 702, 155 F. Supp. 2d 766 (2001).[5] For example, in Olin Corporation-Brass Group v. United States, the ITC based its decision not to cumulate on the fact that one subject nation's principal producer had an affiliated relationship with a large U.S. producer, which the ITC determined would cause its exports to compete differently than those of the other subject nations upon revocation.  See 28 CIT 29, 33-34 (2004).  Here, Tenaris, the sole producer, made an even more significant commitment to domestic production than the producer in Olin by purchasing Maverick.  The ITC relied on this purchase to support its conclusion that Argentinean, Italian, and Mexican OCTG will compete differently than OCTG from Japan and Korea.[6]  Accordingly, the ITC did not abuse its discretion in

---

[5] 19 U.S.C. § 1675a(a)(7) specifically instructs the ITC to consider whether subject goods would compete with each other upon revocation of the order.  Thus, the ITC has the discretionary authority to consider differences in the relative competitive conditions the goods would face upon revocation in making its cumulation decision.  See Allegheny Ludlum, 30 CIT at __, 475 F. Supp. 2d at 1378.

[6] The ITC also relied on the following in making its decision not to cumulate: (1) the differences in the respective product mixes; and (2) the differences in the relative importance of home market sales.  See Five Year Review at 15.

basing its decision not to cumulate all of the OCTG orders on its conditions of competition analysis.

### ii.  **The ITC Did Not Abuse Its Discretion In Not Cumulating the Japan and Korea Orders.**

The ITC also relied on its assessment of the relative conditions of competition as its basis for not cumulating the Japan and Korea OCTG orders.  Specifically, the ITC relied on Japanese and Korean market behavior, including differences in market participation, production capabilities, and capacity utilization rates.  U.S. Steel does not challenge these findings, but again argues that the ITC abused its discretion in relying on factors it views as unrelated to the purposes of cumulative analysis.  This argument fails.  Reliance on divergent historic or likely volume trends in cumulation decisions has been repeatedly affirmed by the Court, and the ITC did not abuse its discretion in relying on these considerations. See Allegheny Ludlum, 30 CIT at __, 475 F. Supp. 2d at 1377-78; Neenah Foundry, 25 CIT at 702, 155 F. Supp. 2d at 766.

### B.  **Substantial Evidence and the ITC's Material Injury Determinations**

During a five-year review, the ITC will revoke an order unless it determines: (1) that dumping or subsidization is likely to continue; and (2) that revocation will lead to the continuation or reoccurrence of material injury within a reasonably foreseeable time.  See 19 U.S.C. § 1675(d)(2)(B).  In

making this decision, the ITC is required to consider whether the "likely volume, price effect, and impact of imports of the subject merchandise on the industry" will be significant if an order is revoked.  19 U.S.C. § 1675a(a)(1)-(4).  U.S. Steel argues that the ITC made several erroneous findings which it contends are not supported by substantial evidence. Essentially, U.S. Steel attacks the substantiality of the ITC's findings by offering its own evidence in support of an alternate conclusion.  However, "the question of the reviewing Court is 'not whether we agree with the Commission's decision, nor whether we would have reached the same result as the Commission had the matter come before us for decision in the first instance.'"  United States Steel Group v. United States, 96 F.3d 1352, 1357 (Fed. Cir. 1996).  It is the ITC's "task to evaluate the evidence it collects during its investigation" and to decide "the weight to be assigned a particular piece of evidence."  Id. at 1357. "In short, the Court does 'not make the determination; [it] merely vet[s] the determination."  Comm. for Fair Beam Imps. v. United States, 31 CIT __, __, 477 F. Supp. 2d 1313, 1319 (2007) (citations omitted).  For the reasons that follow, the Court finds that the ITC's material injury determinations are supported by substantial evidence.

###    i.   The Argentina and Italy OCTG Orders

The ITC determined that revoking the cumulated Argentina and Italy OCTG orders would not cause material injury to U.S. OCTG producers.  As required by section 1675a(a), the ITC considered the volume and price impacts of revoking the orders in making its injury determinations.  U.S. Steel now argues that several aspects of the ITC's determinations are not supported by substantial evidence.  Specifically, U.S. Steel objects to the ITC's conclusions regarding: (1) Tenaris' acquisition of Maverick; (2) Tenaris' expressed interest in obtaining business from multinational oil companies; (3) the attractiveness of the U.S. OCTG price; (4) Tenaris' acquisition of Hydril, Inc. ("**Hydril**"); and (5) the likely price impact of revoking the cumulated Argentina and Italy OCTG orders.

### 1. ITC's Consideration of Tenaris' Maverick Acquisition

U.S. Steel first argues that the ITC erred in concluding that Tenaris' Maverick acquisition would limit the company's post-revocation OCTG exports from Argentina and Italy. According to U.S. Steel, Tenaris has indicated that it will increase its exports to the United States if the order is revoked; particularly of high-grade OCTG products which Maverick cannot produce domestically.[7]  However, the ITC addressed this

---

[7] OCTG production is generally divided into two categories: (1) seamless or high-grade OCTG; and (2) welded or low-grade OCTG.

argument finding that Tenaris' exports to the United States will be limited by its three billion dollar investment in Maverick, and in finding that as prices for high and low-grade OCTG "are interrelated, any attempt by Tenaris to establish low prices for [for high-grade OCTG] would reduce the prices it could get for the Maverick product." Five Year Review at 34. The ITC also found credible statements by Tenaris officials indicating that the company purchased Maverick to obtain U.S. market prices, and would only export OCTG to the United States as necessary to complement domestic production.

The ITC's determination is supported by substantial evidence. The ITC reasonably concluded that Tenaris' exports of Argentinean and Italian OCTG to the United States would be constrained by its substantial investment in Maverick and that Tenaris' business model would only require limited subject exports to fill product gaps. Tenaris' production data indicates that it already exports to the U.S. high grade OCTG from non-subject mills in Canada and Romania (i.e., OCTG Maverick is incapable of producing), and would only need to bring in Argentinean and Italian OCTG to fill product gaps. The fact that several U.S. firms utilize a similar strategy further supports the ITC's conclusion, and in all, substantial evidence

supports the ITC's conclusion regarding the impact of the

Maverick acquisition.[8]

### 2. ITC's Consideration of Sales to Multinational Oil Companies

Next, U.S. Steel argues that the ITC erred in not granting

greater weight to Tenaris' expressed interest in selling OCTG to

multinational oil companies.  Specifically, U.S. Steel argues

that this interest will lead the company to export significant

volumes of OCTG to the United States.  In support of this

argument, U.S. Steel points to several statements by Tenaris'

officials discussing the company's interest in doing business

with the oil companies.  However, the ITC discounted the overall

importance of this sector based on the following findings: (1)

that the great majority of oil rigs in the United States are

owned and operated by independent contractors, not by

multinational oil companies; and (2) that direct sales to end

users account for only a fraction of the domestic OCTG market.

---

[8] U.S. Steel also points to statements by Tenaris officials related to the company's historic difficulties in obtaining access to the U.S. OCTG market.  According to U.S. Steel, these statements indicate that Tenaris acquired Maverick to gain access to the U.S. market and are compelling evidence of Tenaris' intent to increase its U.S. exports.  Again, the weighing of the evidence is the specific province of the ITC and the Court only evaluates whether the ITC's conclusions are supported by substantial evidence.  See Stalexport v. United States, 19 CIT 758, 763-64, 890 F. Supp. 1053, 1059 (1995).  The ITC considered Tenaris' statements but found them outweighed by other evidence regarding the impact of the Maverick acquisition, as discussed above.  The ITC did not err in deciding not to grant greater weight to these statements.

Based on these findings, the ITC found that sales to multinational oil companies are only a small fraction of the overall U.S. OCTG market.  As a result, the ITC determined that even if Tenaris were to increase its exports to multinational oil companies within the United States, these sales would not have a significant impact on the volume of OCTG entering the U.S. market from Argentina and Italy.

This determination is supported by substantial evidence. The ITC did not ignore Tenaris' comments regarding its interest in doing business with multinational oil companies, but instead found that these sales would not have a significant volume impact based on the size and importance of this market sub-sector.  As the ITC noted, Tenaris did not express a similar interest in supplying distributors or independent contractors who operate the large percentage of U.S. oil wells.  U.S. Steel's argument focused narrowly on Tenaris' statements regarding its plans and intentions as to the multinational oil companies.  Accordingly, the ITC reasonably determined that even were Tenaris to increase its sales to this sector, these sales would not have a significant volume impact.

### 3. <u>ITC's Conclusions Regarding the Attractiveness of the U.S. Market Prices</u>

U.S. Steel further challenges the ITC's conclusion that U.S. OCTG prices will not cause Tenaris to increase its exports to the United States.  In U.S. Steel's view, the ITC erred in

relying on Average Unit Value ("**AUV**") data, which indicated that Argentinean and Italian producers could obtain higher prices for OCTG within their home markets.  This argument, however, misconstrues the ITC's analytical process.  Overall, the ITC found that the record was mixed as to the attractiveness of the U.S. market price for OCTG.  Although there was testimony indicating that the U.S. market price was higher than other markets, other pricing information indicated that two out of three of the Tenaris mills could obtain higher home market prices for OCTG.  Five Year Review at 30.  Based on this mixed data, the ITC determined that the U.S. price of OCTG was not a significant enough of an incentive to cause subject producers to shift significant exports to the U.S. market.  Notably, U.S. domestic producers, in support of the orders continuation provided pricing data indicating higher home market prices for the Argentinean and Italian producers.  Id. at 30.  Based on this inconclusive pricing data, the ITC reasonably found that "the record as a whole, did not support the proposition that U.S. prices have been or are likely to be consistently higher than the [subject OCTG] in their other markets."  Id. at 31.

### 4. ITC's Consideration of the Impact of Tenaris' Purchase of Hydril

U.S. Steel also argues that the ITC erred in concluding that Tenaris' acquisition of Hydril, a U.S. company specializing in threading high-grade OCTG, would not lead Tenaris to export

significant volumes of high-grade OCTG to the U.S. market.  In U.S. Steel's view, Tenaris' Hydril acquisition would lead the company to export high-grade OCTG to the United States and displace Hydril's U.S. suppliers.

In its impact determination, the ITC relied on a statement by U.S. Steel's CEO which indicated that he did not believe Tenaris' acquisition would imperil U.S. Steel's role as a supplier of high-grade OCTG to Hydril.  See Five Year Review at 31.  The ITC found this statement to be credible evidence that this acquisition would not cause significant product displacement, particularly as U.S. Steel was [ ].  Tenaris officials also testified that the Hydril acquisition may result in a greater need for U.S.-produced OCTG product, as a key component of Tenaris' global strategy.  Additionally, the ITC found no evidence indicating that, even if Tenaris began exporting additional high grade OCTG to the United States, the exports would necessarily come from its Argentinean or Italian mills rather than its other non-subject mills.  In short, the ITC reasonably relied on the testimony of U.S. Steel's CEO and Tenaris' officials to support its conclusion regarding the impact of the Hydril acquisition.  These findings support the ITC's conclusions that the likely volume impact of the Hydril acquisition will be insignificant.

### 5.  The ITC's Likely Price Determination

Lastly, U.S. Steel argues that the ITC erred in concluding that revocation of the Argentina and Italy OCTG orders would not have a significant impact on the price of OCTG.  U.S. Steel again bases its argument on the ITC's conclusions regarding Tenaris' Maverick acquisition, this time arguing that Tenaris will focus on the high-grade OCTG market and drive down prices for this segment.  This argument hinges upon the fact that the Maverick mill is only capable of producing low-grade OCTG, and U.S. Steel's insistence that Tenaris will import significant volumes of high-grade OCTG due to Maverick's limited production capabilities.

U.S. Steel oversimplifies the ITC's analysis.  The ITC found that any attempt by Tenaris to lower the U.S. market price of high-grade OCTG would also drive down the prices of low-grade OCTG, and harm its investment in Maverick.  This finding relies on the interrelationship of high and low-grade OCTG prices, and the strong market demand for OCTG.  In its investigation, the ITC found that prices for welded (low-grade) and seamless (high-grade) OCTG were highly interconnected, and that welded and seamless OCTG were to a degree, substitutable or capable of performing the same functions.  The ITC also looked at pricing data and found that price movements within this sector are largely fueled by demand, which is very strong despite

substantial market penetration and increases in import volume. Based on these findings, the ITC concluded that revocation of the order would not have a significant impact on the price of U.S. OCTG. U.S. Steel does not contest the accuracy of these findings, but instead argues that the ITC failed to address its concerns regarding Tenaris' motivations in the high-grade OCTG market. The ITC, however, reasonably addressed these concerns in its evaluation of the interconnection of high- and low-grade market sectors, particularly in its conclusions as far as substitutability of the products in the operations of oil wells. Accordingly, the ITC's determinations that revocation of the Argentina and Italy OCTG orders would not have a significant price impact, and would not cause material injury to U.S. producers are supported by substantial evidence.

### ii. The Japan OCTG Order

The ITC also determined that revoking the Japan OCTG order would not materially injure U.S. producers. U.S. Steel challenges this decision; specifically, (1) the ITC's likely volume determination; and (2) the ITC's likely price determination.

### 1.  The ITC's Likely Volume Determination

The ITC found that while revoking the Japan OCTG order would result in additional imports, these imports would be not have a significant impact. U.S. Steel argues that the ITC

failed to meaningfully address its concerns regarding the importance of the Alaskan OCTG market. Specifically, U.S. Steel objects to the ITC's finding that "while subject Japanese imports to Alaska did increase during the original period of investigation, the domestic industry's shipments to Alaska increased by an even greater amount." Five Year Review at 39. According to U.S. Steel, this distinction is meaningless because Japanese producers [ ] market share during this review, and concerns regarding the Alaska market [ ]. In U.S. Steel's view, this reliance on pre-order data demonstrates that the ITC failed to properly consider the importance of the Alaskan market.

The ITC reasonably discounted the importance of Alaskan market. The ITC relied on the pre-order data in context with several other findings related to likely market conditions, including demand for OCTG in both the U.S. and world markets. During the period of review, (1) Japanese capacity utilization was very high — 98.3%; (2) Japanese production capacity was anticipated to decrease in 2007, and only increase marginally though 2008; and (3) current OCTG inventories were low and mostly pre-sold to non-U.S. purchasers. The ITC also found that Japanese producers would not substantially shift production from non-subject products to subject OCTG because of existing contractual relationships with customers within the home market. Additionally, the Alaskan market only accounted for a small

portion of the overall OCTG market—seven out of 1744 U.S. oil rigs.  These findings support the ITC's conclusion that any increase in Japanese OCTG imports would be insignificant when placed in context with the large and growing U.S. OCTG market.

Even if the ITC's conclusion regarding the Alaska market were in error, the Court will not remand if the ITC's determination, taken as a whole, is supported by substantial evidence.  See U.S. Steel Group, 96 F.3d at 1364-65.  In the present case, the ITC found that "limited unused capacity in the Japanese industry, substantial commitments to existing customers, limited motivation to increase imports by shifting shipments from other customers or products, and likely continued strong demand in the U.S. and worldwide markets" supported its conclusion that revoking the Japan OCTG order was unlikely to cause Japanese producers to export significant volumes of product.  Five Year Review at 39.  Accordingly, the ITC's volume determination is supported by substantial evidence.

### 2.  The ITC's Likely Price Determination

U.S. Steel argues that the ITC improperly based its price determination on data from the original investigation which was used to establish the initial antidumping duty order.  The ITC, however, did not base its decision on the pre-order data alone, but relied on this data in context with other available evidence.  Overall, the ITC found that the mixed pre-order

record of Japanese underselling combined with current demand for OCTG, the substantial pre-existing home market commitments of Japanese producers, and relatively high world prices indicated that revocation would not significantly impact the U.S. OCTG price.  This conclusion is supported by substantial evidence. First, data from the original investigations provide support for the ITC's conclusion.  This data indicates that even historically, the record was mixed as to issue of whether Japanese producers were undercutting the U.S. OCTG market price; in 24 out of 40 quarterly comparisons, Japanese producers oversold U.S. producers.  Additionally, the Japanese OCTG sector has operated at very high rates of capacity utilization, selling most of its production [ ], and as a result, would be unlikely to export significant volumes of OCTG to the U.S. market.  The ITC's findings regarding the strength of the U.S. market and world prices are undisputed by U.S. Steel.  When the ITC's analysis is considered in total, substantial evidence supports both the ITC's determination regarding the price impact and its conclusion that revoking the Japan OCTG order would not materially injure U.S. OCTG producers.

### iii. The Korea OCTG Order

Finally, U.S. Steel challenges the ITC's decision that revoking the Korea OCTG order would not significantly increase the volume of Korean OCTG exports entering the U.S. market.

Specifically, U.S. Steel argues that the ITC erred in: (1) calculating Korea's production capacity; and (2) in finding that Korean producers would not engage in significant product shifting upon revocation.

The ITC found that Korean OCTG producers would likely utilize their remaining production capacity to produce subject OCTG, but that this would not result in a significant increase in exports because Korean producers had (1) limited unused production capacity, and (2) strong home market demand for non-subject welded products, which would limit Korean producers' ability and incentive to shift production toward subject OCTG. In calculating Korea's capacity, the ITC did not assume that Korean OCTG producers would devote all excess capacity to OCTG production because this amount would be "well above the amount of [OCTG] that Korean producers produced in any year of the original investigation, first review, or current review."  Id. at 41 n.295.  The ITC set Korea's capacity at [ ]; a figure based on the unused production capacity during 2006, the last year of the review.  This figure resulted in an overall capacity utilization rate of [ ].  Based on these assumptions, the ITC found that Korean producers could increase their U.S. OCTG exports by [ ]; an amount that in the context of the U.S. market, it found would not have a significant impact.

U.S. Steel argues that this capacity calculation is in error because, in its view, the mere fact that Korea has not historically utilized all of its capacity is no evidence that they will not do so in the future.  The ITC is required to determine the likely volume of subject imports that will enter the market upon revocation of the order, rather than the merely possible.  See § 1675a(a)(2).  As such, the ITC reasonably determined that the likely utilization rate would not exceed historical levels and properly used this data as a capacity benchmark.

The ITC also reasonably concluded that Korean producers would not engage in significant product shifting upon revocation of the OCTG order.  U.S. Steel argues that this determination is in error because steel producers generally prefer to produce OCTG, and that the record contradicts the ITC's conclusion because it demonstrates that Korean producers have engaged in some product shifting.  The ITC found that Korean producers will not engage in significant product shifting because of the Korean producers' substantial and long-lasting relationships with their home market.  During the review period, Korean producers devoted [ ] of their total milling capacity to their home market.  The ITC also noted that the capacity utilization for non-subject pipe and tubing was [ ] as opposed to [ ] for subject OCTG.  The fact that the capacity utilization rate for non-subject products

was [   ] than the capacity utilization rate for subject OCTG, in the ITC's view, demonstrated that "Korean producers would not have a strong incentive to shift production from other tubular products with a stable, substantial home market in order to increase exports of [OCTG]." Five Year Review at 42.[9]  The ITC also discounted the product shifting pointed to by U.S. Steel, finding that "[w]hile some increase in subject imports from Korea is likely upon revocation" this would not be significant because of limited OCTG capacity in relation to the overall U.S. OCTG market, the growth in U.S. demand, the fact that Korean OCTG producers already exported most of its products to the U.S. and thus, would be unlikely to export more upon revocation, and the fact that product shifting was unlikely.  Id.

The ITC's conclusion regarding product shifting is supported by substantial evidence.  First, the ITC reasonably concluded that the substantial home market demand for non-subject steel products would prevent producers from exporting significant volumes of OCTG to the United States based on the size and strength of the home market.  Second, the ITC reasonably concluded that although some increase in subject

_____

[9] U.S. Steel also claims that the ITC erred in finding the Korean home market for non-OCTG products stable as from 2001-2006, Korean sales [   ].  However, the ITC reasonably found this market stable.  Korean producers, throughout the period of review, devoted [   ] of their overall capacity for home market production.  The Court will not re-weigh the ITC's reasonable assessment of the stability of the Korean home market.

imports was likely, that these would not be significant in relation to the growing U.S. OCTG market.

## C. Fair and Impartial Hearing

U.S. Steel argues that it was denied its right to a fair and impartial hearing because the ITC allowed Maverick to testify in support of continuing the Japan and Korea OCTG orders.[10]  The ITC held a public hearing on April 12, 2007. Following its past practice, the ITC allowed the parties supporting and opposing the continuation of the orders to testify for an hour each.  The ITC gave Maverick ten minutes to testify in support of continuing the Japan and Korea OCTG orders.  U.S. Steel shared the remaining fifty minutes with the other domestic producers.  Parties in opposition to the orders testified for a full sixty minutes, which was then followed by unlimited questioning by the Commissioners and staff.

The statutory framework does not provide specific guidance as to the type of hearing the ITC is to conduct within the five-year review context. However, the legislative history provides that the ITC must "permit full presentation of information and views by the parties," which includes affording parties "every

_____

[10] The relevant statutory provisions do not expressly provide a right to a fair and impartial hearing.  See 19 U.S.C. § 1677c(b).  This language instead comes from the ITC's regulations authorizing it to conduct non-adjudicative hearings. See 19 C.F.R. § 201.13(b)(2). Five year review hearings are non-adjudicative and subject to this regulation.  See Grupo Indus. Camesa v. U.S., 18 CIT 461, 463, 853 F. Supp. 440, 442-43 (1994), aff'd 85 F.3d 1577 (Fed. Cir. 1996).

possibility to respond to information submitted by other parties." S. Rep. No. 96-249, at 97, as reprinted in 1979 U.S.C.C.A.N. 381, 483. In this case, U.S. Steel and the other domestic producers had ample opportunity to present their information and to respond to the other parties. Notably, U.S. Steel does not argue that it was prevented from presenting any information during the hearing. There is no requirement in the relevant statutes and regulatory provisions, or even in the legislative history, that the ITC must allocate precisely the same amount of time to each side in order to be fair and impartial. Additionally, Maverick, as a domestic producer, has a right to testify in support of continuing the Japan and Korea OCTG orders. Accordingly, the ITC hearing was fair and impartial.

## IV. CONCLUSION

In light of the foregoing, the results of the ITC's five-year review in Oil Country Tubular Goods from Argentina, Italy, Japan, Korea, and Mexico, Inv. Nos. 731-TA-711 and 731-716 (second review), USITC Pub. 3923 (June 2007) are sustained.

/s/ Richard W. Goldberg
**Richard W. Goldberg**
**Senior Judge**

**Date:     August 5, 2008**
**          New York, New York**